**BOISE CASCADE CORPORATION,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 01–5106.

United States Court of Appeals,
Federal Circuit.

Decided: July 19, 2002.

Rehearing and Rehearing En Banc
Denied: Sept. 3, 2002.

Phillip D. Chadsey, Stoel Rives LLP, of Portland, Oregon, argued for plaintiff-appellant. With him on the brief was Charles F. Adams.

Kathryn E. Kovacs, Attorney, Environment & Natural Resources, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were John Cruden, Acting Assistant Attorney General; Katherine Barton, and Kristine Tardiff, Attorneys.

Before CLEVENGER, circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

CLEVENGER, Circuit Judge.

Boise Cascade ("Boise") appeals the judgment of the Court of Federal Claims dismissing its complaint for failure to state a claim. *Boise Cascade Corp. v. United States,* No. 99–860 L (Ct. Fed. Cl. April 10, 2001). We affirm.

I

This case involves a 65–acre tract of old-growth forested land known as the Walker Creek Unit, located in Clatsop County, Oregon. Boise owns the Walker Creek Unit, which was home to a nesting pair of northern spotted owls until late 1996. The spotted owl is listed as a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, and is protected by both the federal government and the State of Oregon.

In January 1997 the nesting female spotted owl was found dead, and the male spotted owl moved to a new nesting area, and a new mate, a few miles from the Walker Creek Unit. In October 1997, the Oregon Department of Forestry ("ODF"), which until that time had prevented Boise from logging in order to protect the owl pair, notified Boise that it was lifting the restriction due to the departure of the male owl. In the letter, however, the ODF warned Boise that the U.S. Fish and Wildlife Service ("Service") might consider logging the land to be a violation of the ESA,[1] and that it therefore recommended consulting the Service before starting to log the land. The Service inspected the land—at Boise's invitation—and determined that logging the parcel could harm spotted owls that might otherwise use the

1. The ESA prohibits the take of a listed species. 16 U.S.C. § 1538(a)(1) (2000). Taking includes harassing, harming, pursuing, wounding, and killing the animal, *id.* § 1532(19), and the Environmental Protection Agency ("EPA") has interpreted "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (2000). Thus, deforestation of breeding habitat constitutes harm under the statute.

site for nesting. Thus, the Service notified Boise that either it could file an application for an Incidental Take Permit ("ITP")[2] under section 10 of the ESA if it wished to log the land, or alternatively it could try to enter into a land swap with the State of Oregon. Boise responded by filing suit in federal district court in Oregon seeking a declaratory judgment that its proposed logging operation would not take any spotted owls, and requesting that the court enjoin the Service from enforcing the ESA against Boise. The United States filed a counterclaim asking the court to enjoin Boise from logging the Walker Creek Unit. *Boise Cascade,* slip op. at 3.

After an initial hearing, the district court dismissed Boise's complaint on ripeness grounds[3] and granted the United States's motion for a preliminary injunction preventing logging pending the results of the Service's 1998 breeding season surveys. Because the United States's counterclaim for a permanent injunction created a ripe controversy, the court allowed Boise leave to file a counterclaim seeking the relief it originally sought in its complaint. During the breeding season survey conducted during the pendency of the preliminary injunction, a juvenile spotted owl was discovered living on the Walker Creek Unit. On October 15, 1998, the district court issued an order dismissing Boise's counterclaims and granting the United States's request to permanently enjoin Boise from logging the Walker Creek Unit without an ITP. Boise did not appeal the entry of the injunction.

Boise applied for an ITP on November 6, 1998. At a hearing on February 5, 1999, the district court ordered the Service to act on the permit application by September 1999. On May 17, 1999, the juvenile spotted owl that had been living at the Walker Creek Unit was found dead. After subsequent surveys found no living owls in the area, on July 30, 1999, the Service sent the following notice to Boise:

> Based on our review of all the information concerning this site over the last three years and the new survey results, the best scientific information currently available indicates that no spotted owls would be taken by Boise Cascade's planned harvest of the property. Therefore, an Endangered Species Act incidental take permit is no longer required.

The district court lifted the injunction on August 17, 1999.

Boise filed a complaint at the Court of Federal Claims on October 6, 1999, seeking just compensation for the "temporary taking of merchantable timber, which it was prevented from logging" due to the injunction entered by the district court in Oregon. Boise advanced four different theories to support its takings claim: (1) a physical taking under *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), based on the denial of its right to exclude spotted owls from its property and the requirement that it allow government personnel to enter the property to conduct

---

**2.** The Secretary has discretion to issue an ITP to permit "any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B) (2000).

**3.** At the time Boise filed its complaint seeking declaratory relief, the Service had not yet

taken any final action with respect to logging the Walker Creek Unit, but rather had simply opined that such logging could violate the ESA by taking owls and suggested that Boise apply for an ITP. Thus, the district court held that Boise's claim for a declaratory judgment was not ripe.

owl surveys during the pendency of the preliminary injunction; (2) a categorical taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), based on the 18–month ban on logging without a permit imposed by the district court's injunction; (3) an exaction-type taking under *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), based on the argument that the injunction did not substantially advance a legitimate government interest under the ESA; and (4) a temporary regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *Boise Cascade*, slip op. at 5. The government moved to dismiss the complaint on the ground that the injunction merely prohibited Boise from logging without a permit, and that it therefore did not constitute a taking as a matter of law under *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The government also moved to dismiss the *Loretto* claim specifically on the ground that there was no forced governmental intrusion and hence no physical taking of the property. Boise cross-moved for summary judgment on all four of its takings theories.

The court denied Boise's motion without prejudice pending disposition of the government's motion to dismiss, which it considered to raise threshold legal issues. *Boise Cascade*, slip op. at 6 & n. 4. The court ultimately found both of the government's arguments persuasive, and granted its motion to dismiss on both grounds. Boise now appeals. We exercise jurisdiction over this appeal from a final judgment of the Court of Federal Claims under 28 U.S.C. § 1295(a)(3).

## II

■ We review *de novo* the legal question whether the Court of Federal Claims properly dismissed Boise's complaint for failure to state a claim. *Dehne v. United States*, 970 F.2d 890, 892 (Fed. Cir.1992). "[I]n reviewing a dismissal for failure to state a claim, we must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir.1991).

■ The Takings Clause of the Fifth Amendment prohibits the government from taking property for public use without "just compensation." U.S. Const. amend. V. This court has developed a two-step approach to takings claims. "First, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights.'" *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed.Cir.2000) (internal citation omitted). If so, the court proceeds to the second step, determining "whether the governmental action at issue constituted a taking of that 'stick.'" *Id.* In this case we may proceed directly to the second step of our analysis, for the government does not contest that Boise possesses a property interest in both its fee simple estate in the Walker Creek Unit and its ownership of the timber that grows there. The issue, then, is whether Boise's complaint has sufficiently alleged that the government took either of these interests.

### A

■ Before reaching the substantive issue in this case, however, we must address a threshold challenge to the trial court's and hence our jurisdiction. The government argues that Boise has asked

the trial court to review the merits of a decision made by a United States district court, and that the Court of Federal Claims does not have jurisdiction to hear such a case. It is true that Article III forbids the Court of Federal Claims, an Article I tribunal, from reviewing the actions of an Article III court such as the Oregon district court. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that 'a judgment conclusively resolves the case' because 'a 'judicial Power' is one to render dispositive judgments.'" (quoting Easterbrook, *Presidential Review*, 40 Case W. Res. L.Rev. 905, 926 (1990))). Furthermore, we have previously affirmed that the Court of Federal Claims "cannot entertain a taking claim that requires the court to 'scrutinize the actions of' another tribunal." *Vereda Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed.Cir.2001) (quoting *Allustiarte v. United States*, 256 F.3d 1349, 1352 (Fed.Cir.2001)).

However, resolution of this case did not require the Court of Federal Claims to review the merits of the district court's order enjoining Boise from logging without a permit. Boise has accepted the validity of the injunction, and only filed suit in the Court of Federal Claims to determine whether the Service's assertion of jurisdiction over it by seeking and obtaining the injunction worked a taking of its property that requires compensation under the Takings Clause. Whether or not the government action took Boise's property was not before the district court, nor could it have

been. Because Boise seeks over $10,000 in compensation for this alleged taking,[4] the Court of Federal Claims is the sole forum available to hear Boise's claim. *See* 28 U.S.C. § 1346(a)(2) (2000). Because the takings claim does not require the trial court to review the district court's actions, there is no constitutional defect in the Court of Federal Claims' assertion of jurisdiction over this case.

The government argues that this case is indistinguishable from *Allustiarte* and *Vereda*, and that those cases therefore mandate dismissal here. We disagree. In *Allustiarte*, the plaintiffs claimed that the court-appointed bankruptcy trustee committed various errors in his management of the bankruptcy estate, and that the bankruptcy court improperly approved the errors. *Allustiarte*, 256 F.3d at 1351. The plaintiffs alleged takings based on the losses they suffered as a result of those alleged errors. *Id.* The trial court dismissed for lack of jurisdiction, and we affirmed because adjudication of the takings claim would require the court to review the propriety of the bankruptcy court and trustee's actions. Such review was committed to the district court and the Ninth Circuit, and save by appeal to those courts, the merits of the bankruptcy court's decision could not be attacked. *Id.* at 1352. In *Vereda*, the plaintiffs had a mortgage interest in an airplane that had been seized by the Drug Enforcement Administration, and had been forfeited in an *in rem* administrative forfeiture proceeding. *Vereda*, 271 F.3d at 1369. Vereda's taking claim in the Court of Federal Claims was based solely "on a challenge to the substantive validity of the forfeiture of its interest in the airplane." *Id.* at 1374. We held that the trial court lacked juris-

4. Boise seeks $295,012 in compensation for the alleged taking.

diction over the claim "because the relevant statutes provide for a comprehensive administrative and judicial system to review the *in rem* administrative forfeiture," which preempted Tucker Act jurisdiction in the Court of Federal Claims. *Id.* at 1375. We also noted that, because the administrative forfeiture was by statute given "the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding in a district court of the United States," *id.* (quoting 19 U.S.C. § 1609(b)), the trial court was precluded, under *Allustiarte,* from reviewing the merits of the forfeiture. The trial court therefore had no jurisdiction over Vereda's takings claim because it was based on whether the substantive provisions of the forfeiture statute had been correctly applied. *Id.*

Boise's situation differs in several important respects from that of the parties in *Allustiarte* and *Vereda.* First, unlike in *Allustiarte,* the government here is not merely an impartial judicial arbiter whose actions have been improperly appealed to the Court of Federal Claims instead of to the appropriate district court or regional circuit court of appeals. The Service, a government agency, filed a claim against Boise seeking to enjoin its logging activities. That the Service chose to effectuate its mandate to enforce the ESA through a court action rather than through an agency cease and desist order, for instance, cannot insulate the United States from its duty to pay compensation that may be required by the Fifth Amendment. Second, unlike in

*Vereda,* Congress has not instituted a comprehensive scheme of administrative and judicial review of possible takings of property occasioned by the Service's enforcement of the ESA. As noted above, the Court of Federal Claims is the *only* forum in which Boise's takings claims could have been brought. Finally, unlike in *Vereda* and *Allustiarte,* Boise's takings claim is not based on the propriety of the district court's decision, and the trial court therefore would not be called upon to review the merits of the district court's decision in order to decide the merits of Boise's claim. Thus, we hold that the trial court properly assumed jurisdiction of the merits of Boise's Tucker Act claim.

### B

The government asserts that no taking could occur in this case because the injunction, which forms the basis for all of Boise's regulatory takings claims,[5] did no more than require that no logging take place without a permit. The government's argument is based largely on the Supreme Court's decision in *Riverside Bayview.* In that case, the Supreme Court analyzed whether the Clean Water Act authorizes the Army Corps of Engineers ("Corps") to require landowners to obtain permits before filling wetlands adjacent to navigable bodies of water. *Riverside Bayview,* 474 U.S. at 123, 106 S.Ct. 455. Riverside Bayview owned such a tract of land and began filling it in preparation for building condominiums. Based on its regulations interpreting the Clean Water Act, the Corps

---

**5.** Although the government also urges us to affirm the dismissal of Boise's *Loretto* claim on the basis of *Riverside Bayview, Riverside Bayview* does not control where the government allegedly takes an easement in or physically occupies the Walker Creek Unit. The *Loretto* claim is independent of the regulatory

takings claims flowing from the permitting requirement imposed by the district court. It is only the claims based on the imposition of the permitting requirement that fall under the rule articulated by the Court in *Riverside Bayview.*

believed that the property was subject to its regulatory jurisdiction. Therefore, the Corps sued Riverside Bayview seeking to enjoin further filling without a permit from the Corps. *Id.* at 124, 106 S.Ct. 455. The district court granted the injunction, and the Sixth Circuit reversed, holding that the statute must be construed narrowly to preclude the Corps' assertion of jurisdiction over Riverside Bayview's land. *Id.* at 125, 106 S.Ct. 455. The Sixth Circuit adopted a narrow construction of the statutory term "waters of the United States" because, "in its view, a broader definition of wetlands might result in the taking of private property without just compensation." *Id.*

The Supreme Court reversed, holding that the Sixth Circuit interpreted the statute too narrowly. In the portion of its opinion relevant to this case, the Court addressed the Sixth Circuit's concern that a broad interpretation of the statute would violate the Takings Clause. The Court first set forth the general rule with respect to when land use regulations may constitute a taking: "if the ordinance does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land." *Id.* at 126, 106 S.Ct. 455 (quoting *Agins,* 447 U.S. at 260, 100 S.Ct. 2138). The Court explained,

> we have made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking. The reasons are obvious. *A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use his property as desired.* Moreover, even if the permit is denied,

there may be other viable uses available to the owner. *Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.*

*Id.* at 126–27, 106 S.Ct. 455 (emphases added and internal citation omitted). *Riverside Bayview* presents a problem for Boise because Boise's position is very similar to that of the landowner in *Riverside Bayview*. Like the *Riverside Bayview* landowner, Boise was enjoined from proceeding with a particular activity without a permit at the behest of the government agency that administers the pertinent permit program. Thus, under the Court's approach in *Riverside Bayview*, the injunction never ripened into a taking because the Service never denied Boise's permit.

■ However, Boise argues that far from foreclosing its claim, *Riverside Bayview* actually supports its theory that a taking occurred. Boise's argument rests on the *Riverside Bayview* Court's statement that even though the Corps' denial of a permit could under certain circumstances be a taking, because an aggrieved landowner can seek compensation under the Tucker Act, "fears that application of the Corps' permit program might result in a taking did not justify the court in adopting a more limited view of the Corps' authority than the terms of the relevant regulation might otherwise support." *Id.* at 128–29, 106 S.Ct. 455. The Court then noted that:

> Because the Corps has now denied respondent a permit to fill its property, respondent may well have a ripe claim that a taking has occurred. On the record before us, however, we have no basis for evaluating this claim.... In any event, this lawsuit is not the proper

forum for resolving such a dispute: if the Corps has indeed effectively taken respondent's property, respondent's proper course is not to resist the Corps' suit for enforcement by denying that the regulation covers the property, but to initiate a suit for compensation in the Claims Court. *In so stating, of course, we do not rule that respondent will be entitled to compensation for any temporary denial of use of its property should the Corps ultimately relent and allow it to be filled. We have not yet resolved the question whether compensation is a constitutionally mandated remedy for "temporary regulatory takings," and this case provides no occasion for deciding the issue.*

*Id.* at 129 n. 6, 106 S.Ct. 455 (emphasis added and internal citations omitted) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). According to Boise, footnote six of *Riverside Bayview* describes its own situation because, of course, the Service did eventually relent and allow logging on the Walker Creek Unit. Thus, argues Boise, *Riverside Bayview* supports its takings claims because it is simply following the course suggested by the Court: not resisting the injunction and suing in the Court of Federal Claims for just compensation. Furthermore, while the *Riverside Bayview* Court refused to address whether a "temporary regulatory taking" would be compensable, the Court recently held that no per se rule applies to temporary moratoria and that whether they are takings must be analyzed under *Penn Central. See Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* —— U.S. ——, 122 S.Ct.

1465, 1489, 152 L.Ed.2d 517 (2002). Thus, if they survive a *Penn Central* analysis, temporary moratoria can be compensable takings. Hence, argues Boise, footnote six of *Riverside Bayview* compels a reversal in this case.

 Boise's interpretation of footnote six is untenable in light of the *Riverside Bayview* Court's earlier explanation regarding when a taking occurs, *i.e.,* after a permit has been denied. Read together with the rest of its opinion, the Court's statement in footnote six regarding compensation for a temporary regulatory taking clearly refers not to normal delays pending a permitting decision, but rather to a situation in which the government first denies a permit but then later relents and lifts the restriction. In other words, the initial denial of a permit is still a necessary trigger for a ripe takings claim.[6] If the government denies a permit, then the aggrieved party can seek compensation. If at some point the government reconsiders the earlier denial and grants a permit (or revokes the permitting requirement), then the aggrieved party can seek compensation for a "temporary regulatory taking." In either case, *Penn Central* will govern whether the initial denial of the permit actually took the property in question. Thus, *Riverside Bayview* supports the proposition that Boise cannot bring a takings claim because the Service never denied Boise's permit.

As the government notes, in *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796 (Fed.Cir.1993), we applied *Riverside Bayview* to a situation extremely similar to the one confronting us here. In *Tabb Lakes* the Corps, tipped off by an anonymous

---

6. An extraordinary delay in permit processing or bad faith on the part of the agency can give rise to a ripe takings claim notwithstanding

the failure to deny the permit. *See Wyatt v. United States,* 271 F.3d 1090, 1097–98 (Fed. Cir.2001).

source, issued a cease and desist order to Tabb Lakes, which had been filling what the Corps considered at the time to be wetlands under its ill-fated migratory bird rule.[7] *Tabb Lakes,* 10 F.3d at 798. The order required Tabb Lakes to cease filling land without a permit from the Corps. Tabb Lakes filed a permit application, but after ten months of negotiations the parties were unable to reach an agreement on a plan to mitigate damages (such a plan is a requirement for issuance of a permit). *Id.* Tabb Lakes then withdrew its permit application and sued for a declaratory judgment that its property was not subject to the Corps' jurisdiction. The district court found for Tabb Lakes, holding that the assertion of jurisdiction by the Corps was procedurally defective because the migratory bird rule had not been promulgated pursuant to the notice and comment provisions of the Administrative Procedure Act ("APA"). *Id.* at 799. The Corps subsequently lost its appeal to the Fourth Circuit. *Id.* Tabb Lakes then filled the putative wetlands and constructed a residential subdivision. It also filed suit in the Court of Federal Claims alleging that the Corps' cease and desist order worked a temporary regulatory taking of the property on which the wetlands were located from the time the order issued until the date that the Fourth Circuit decision became final. *Id.*

The Court of Federal Claims rejected the takings claim, and we affirmed. We noted that while the cease and desist order did halt all development of the property, it was not necessarily a taking because "[a] taking by regulatory action is recognized only if such action goes 'too far.'" *Id.* at

800 (quoting *Lucas v. S. Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). Relying on *Riverside Bayview,* we held that the type of interference in *Tabb Lakes* did not go "too far" as a matter of law: "In this case the cease and desist order, while stopping the filling of wetlands, specifically left the door open to development by obtaining a permit. That type of regulatory action has been unequivocally held *not* to effect a taking." *Id.* at 800–01. Thus, we held that the Corps' cease and desist order did not give rise to a taking.

Boise's situation is indistinguishable from that of the landowner in *Tabb Lakes.* The sole difference between the two is that instead of an agency cease and desist order, Boise was subject to a court-ordered injunction. But this is a distinction without a difference. Like the *Tabb Lakes* plaintiffs, Boise was enjoined from a particular use of its property but was given an escape hatch: it could apply for a permit. We see no reason why the result in this case should differ from that in *Tabb Lakes*—no taking occurred because the government never denied the permit.

■■■ Boise attempts to distinguish *Tabb Lakes* by arguing that unlike the Clean Water Act, the ESA does not require permitting. Thus, it argues, absent the injunction, it could choose to log without an ITP. This distinguishes *Tabb Lakes,* says Boise, because "once the government obtained the injunction, obtaining an ITP became (even if feasible) a condition subsequent that could end the period during which Boise's private land was, by government compulsion, already being devoted to public use." This argument does not dis-

---

7. The Supreme Court has rejected the interpretation of the Clean Water Act embodied in the migratory bird rule. *See Solid Waste* *Agency v. United States Army Corps of Eng'rs,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001).

tinguish *Tabb Lakes,* for absent the cease and desist order, the *Tabb Lakes* landowner also could have gone forward with filling its land without a permit. The cease and desist order (or, in this case, the injunction) was the point at which the agency first asserted regulatory jurisdiction over the landowner. Up to that point, no permit was required either in *Tabb Lakes* or here. To the extent Boise argues that the ESA did not give the district court the power to enjoin logging without a permit, its argument is not well taken. First, as discussed above, a takings claim before the Court of Federal Claims cannot ask that court to review the propriety of a district court's handling of a case. Second, as the Ninth Circuit has repeatedly held, the district court did have the authority to enjoin Boise from logging. *Marbled Murrelet v. Babbitt,* 83 F.3d 1060, 1066 (9th Cir.1996) (holding that "[a] reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA"); *see also Defenders of Wildlife v. Bernal,* 204 F.3d 920, 925 (9th Cir.2000) (same). Because the district court had the power to permanently enjoin Boise from logging, it certainly had the power to enjoin it from logging without a permit. And even assuming *arguendo* that the district court did not possess the power to force Boise to apply for a permit if it wished to log, this still does not distinguish *Tabb Lakes,* for in that case the Corps' assertion of regulatory jurisdiction was determined to be invalid by both the district court and the Fourth Circuit. Thus, indulging in the assumption that the ESA did not give the district court the power to issue the injunction only makes this case more rather than less similar to the factual situation in *Tabb Lakes.*

As the government notes, we recently reaffirmed the vitality of *Tabb Lakes* in *Wyatt v. United States,* 271 F.3d 1090 (Fed.Cir.2001), and held that absent denial of the permit, only an extraordinary delay in the permitting process can give rise to a compensable taking. In *Wyatt,* a mining company sued to recover compensation for a temporary taking of its mineral interests while its permit application was pending before the Office of Surface Mining Regulation and Enforcement ("OSM"). *Id.* at 1095. We began our analysis by reiterating the rule of *Riverside Bayview* that the mere imposition of a permit requirement does not take property under the Fifth Amendment. *Id.* at 1097–98. Furthermore, we noted that "mere 'fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership.'" *Id.* at 1098 (quoting *First English Evangelical Lutheran Church v. L.A. County, Calif.,* 482 U.S. 304, 320, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). Citing *Tabb Lakes,* we held that only extraordinary delay in the permitting process can give rise to a taking if the permit has not been denied. *Id.* (noting that "it is true that a taking may occur by reason of 'extraordinary delay in governmental decisionmaking,'" but cautioning that "[b]ecause delay is inherent in complex regulatory schemes, we must examine the nature of the permitting process as well as the reasons for any delay," and noting that "it is the rare circumstance that we will find a taking based on extraordinary delay without a showing of bad faith" (quoting *Tabb Lakes,* 10 F.3d at 803)). We then analyzed the highly complex permitting process used by OSM, and held that under the circumstances no extraordinary delay occurred in the permitting process. *Id.* at 1099–100.

As noted above, Boise does not allege that the Service engaged in extraor-

dinary delay in processing its permit. Therefore, under *Riverside Bayview, Tabb Lakes,* and *Wyatt,* we must reject Boise's regulatory takings claims because they are based on the mere imposition of a permitting requirement. Those cases make it perfectly clear that the imposition of such a requirement, without more, simply cannot give rise to a compensable taking. However, Boise contends that the Supreme Court's most recent statement on regulatory takings jurisprudence, *Tahoe,* which unambiguously rejects the application of per se rules in the regulatory takings context, has undercut the *Riverside Bayview* line of cases and precludes the dismissal of its claims here. We disagree with Boise's reading of *Tahoe.*

In *Tahoe,* the Court rejected application of the per se rule articulated in *Lucas*[8] to temporary development moratoria. The *Tahoe* Court emphasized that, except in the rare situation before the Court in *Lucas* in which a plaintiff had been permanently deprived of all economic value associated with the property, whether a taking has occurred is governed by the ad hoc factual inquiry of *Penn Central.* The landowners in *Tahoe* advocated for a per se rule to compensate them for temporary development moratoria imposed on their land. In rejecting the landowners' proposed per se rules for temporary regulatory takings, the Court noted that it did "not hold that the temporary nature of a land-use restriction precludes finding that it effects a taking; we simply recognize that it should not be given exclusive significance one way or another." *Tahoe,* 122 S.Ct. at 1486. The Court further stated that "[i]t is worth emphasizing that we do not reject a categorical rule in this case because a 32–month moratorium is just not that harsh. Instead, we reject a categorical rule because we conclude that the *Penn Central* framework adequately directs the inquiry to the proper considerations—only one of which is the length of the delay." *Id.* at 1487 n. 34. The Court explicitly analogized the temporary moratoria at issue in *Tahoe* to permitting delay cases:

> Petitioners fail to offer a persuasive explanation for why moratoria should be treated differently from ordinary permit delays. They contend that a permit applicant need only comply with certain specific requirements in order to receive one and can expect to develop at the end of the process, whereas there is nothing the landowner subject to a moratorium can do but wait, with no guarantee that a permit will be granted at the end of the process. Setting aside the obvious problem with basing the distinction on a course of events we can only know after the fact—in the context of a facial challenge—petitioners' argument breaks down under close examination because there is no guarantee that a permit will be granted, or that a decision will be made within a year.

*Tahoe,* 122 S.Ct. at 1487 n. 31 (internal citation omitted). Boise argues that, due to the Court's explicit analogy between permitting delays and moratoria, *Tahoe* mandates that their regulatory takings claims be analyzed on the merits under *Penn Central* instead of dismissed as not ripe under *Riverside Bayview* and *Tabb Lakes.*

The Court in *Tahoe* did not confront a situation in which the delay alleged to be a

---

**8.** In *Lucas,* the Court held that a per se regulatory taking occurs when a regulation permanently destroys all economic value in the property. *Lucas,* 505 U.S. at 1019, 112 S.Ct. 2886.

taking arose only from a reasonable time taken to consider a permit application. Nor did the Court have to consider a case in which a takings claim is brought despite the fact that the permit was never denied or was actually granted.[9] The moratoria in *Tahoe* admitted of no exceptions; no permits or variances could be granted, and therefore the purported taking ripened immediately upon application of the moratoria to the property at issue. In contrast, in this case (as in *Tabb Lakes, Wyatt,* and *Riverside Bayview*), the permitting agency had not yet decided whether to grant the permit, and in fact in this case the Service actually lifted the permit requirement without ever having denied Boise's permit application. Thus, the situation before the Court in *Tahoe* is very different from both the *Riverside Bayview* line of cases and the case we decide today.

The *Tahoe* Court did not explicitly overrule, or even discuss, the ripeness rule articulated in *Riverside Bayview.* Thus Boise argues, in essence, that the Court overruled *Riverside Bayview* sub silentio in footnote 31 of its opinion in *Tahoe.* Despite the narrowness of its holding, the Court in *Tahoe* provided an exceptionally thorough analysis of the landscape of takings law. It is worth noting that in its painstaking treatment of takings jurisprudence, the Court did not discuss ripeness at all, and did not explicitly overrule, limit, distinguish, or even mention *Riverside Bayview.* The rule that a taking does not ripen unless a permit is applied for and denied actually predates *Riverside Bayview. See Williamson County Reg'l Planning Comm'n,* 473 U.S. at 186, 105 S.Ct. 3108 (holding that "[a]s the Court has

made clear in several recent decisions, a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue"); *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 297, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (rejecting a Takings Clause challenge to the Surface Mining Control and Reclamation Act in part because the challengers had not yet availed themselves of administrative procedures for obtaining a variance from the requirements of the act and noting that "[t]he potential for such administrative solutions confirms the conclusion that the taking issue ... simply is not ripe for judicial resolution"); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 927 (5th Cir.1983) (holding that takings claim does not ripen until a permit application is denied); *United States v. Byrd,* 609 F.2d 1204, 1211 (7th Cir.1979) (holding that no takings claim can arise unless a permit is denied). Furthermore, that rule has been consistently followed not only by our court, but also by our sister circuits and the district courts. *E.g., Adams v. United States,* 255 F.3d 787, 794–95 (9th Cir.2001) (following *Riverside Bayview* to reject argument that mere imposition of a permitting requirement, absent application for and denial of a permit, constitutes a taking); *Gilbert v. City of Cambridge,* 932 F.2d 51, 56 (1st Cir.1991) (same); *Rybachek v. United States Envtl. Prot. Agency,* 904 F.2d 1276, 1300 (9th Cir.1990) (same); *United States v. Vogler,* 859 F.2d 638, 642 (9th Cir.1988) (holding takings claim not

---

9. The practical effect of the Service's decision to lift the permit requirement for logging the Walker Creek Unit was the same, of course,

as if it had simply decided to grant Boise's permit.

ripe under *Riverside Bayview* because landowner never applied for a permit); *United States v. Moseley,* 761 F.Supp. 90, 93 (E.D.Mo.1991) (following *Riverside Bayview* and holding takings claims unripe absent denial of a permit); *Lakewood Assoc. v. United States,* 45 Fed.Cl. 320, 332 (1999) (holding that application for and denial of a permit is necessary to a ripe takings claim absent futility or a showing that the permitting procedure is so burdensome as to effectively deprive the plaintiff of his property rights); *see also Moore v. United States,* 943 F.Supp. 603, 613–14 (E.D.Va.1996) (collecting cases). We think it unlikely that the Court meant, in footnote 31, to overrule by implication this well-settled ripeness jurisprudence, which includes three of its own prior cases (*Williamson, Hodel,* and *Riverside Bayview*).

Furthermore, we disagree with Boise's characterization of the meaning of footnote 31. In that footnote, the Court simply noted that for purposes of determining whether a taking has occurred, temporary moratoria should be treated like permitting delay cases. Thus, whether a taking occurred should be analyzed under *Penn Central.* This does not affect the longstanding rule that, absent denial of a permit, only extraordinary delays in the permitting process ripen into a compensable taking. Whether a particular extraordinary delay constitutes a taking is governed by *Penn Central,* just as are temporary moratoria.

Under this reading, of course, the Court's holding in *Tahoe* does not overrule *Riverside Bayview* and the cases that rely upon it—including *Tabb Lakes* and *Wyatt*—implicitly or otherwise. These authorities support, and indeed compel, dismissal of Boise's regulatory takings claims

because they are based on nothing more than the bare assertion of regulatory jurisdiction by imposition of a permitting requirement. Boise makes no claim of delay in the permitting process. Thus, we affirm the trial court's dismissal of the regulatory takings claims.

## C

Boise also argues that the district court's injunction worked a per se taking under the Supreme Court's decision in *Loretto* because (1) it was prevented from excluding spotted owls from its property; and (2) it was required to allow government agents to enter its property to conduct owl surveys. The trial court disagreed because it found that these two conditions "were incidents of the permitting process that were transitory in character, involved no continuous governmental presence at the site and imposed no additional burdens on the property beyond the temporary curtailment of logging inherent in the permitting process itself." *Boise,* slip op. at 8. We agree with the trial court that the nature of the intrusion complained of in this case does not make out a per se takings claim under *Loretto.*

The Court in *Loretto* held that a permanent physical occupation of property, no matter how slight, is a per se taking. *Loretto,* 458 U.S. at 441, 102 S.Ct. 3164. *Loretto* involved a New York statute that compelled landlords to allow cable companies to install boxes on their buildings. *Id.* at 423–24, 102 S.Ct. 3164. The question before the Court was whether the balancing test articulated in *Penn Central* should apply in such a situation. The Court rejected the application of *Penn Central* and held that the compelled cable installation was subject to a traditional rule that all

permanent physical invasions are takings. *Id.* at 438, 102 S.Ct. 3164.

The holding of *Loretto* is quite narrow. It applies only to permanent physical occupations either by the government or by a third party acting under government authority. The Court distinguished permanent physical occupations, in which it had always found a taking, from "cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within," which were not always takings. *Id.* at 428, 102 S.Ct. 3164. The Court noted that "[m]ore recent cases confirm the distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property." *Id.* at 430, 102 S.Ct. 3164. The Court held that of the three, only a permanent physical occupation is a per se taking, and courts therefore need not engage in a balancing test when confronted with such a situation. *Id.* at 434–35, 102 S.Ct. 3164.

■ Physical invasions (as distinct from physical occupations) thus fall outside the *Loretto* rule. A physical occupation, as defined by the Court, is a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property. The Court defined the destruction of these interests as follows: (1) possession, "the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space," *id.* at 435, 102 S.Ct. 3164; (2) use, "the permanent physical occupation of property forever denies the owner any power to control the use of the property; he not only cannot exclude others, but can make no nonpossessory use of the property," *id.* at 436, 102 S.Ct. 3164;

and (3) disposal, "even though the owner may retain the bare legal right to dispose of the occupied space ..., the permanent occupation of that space ... will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property," *id.* The Court carefully distinguished physical occupations (to which the *Loretto* rule applies) from temporary physical invasions of property by the government (to which the *Loretto* rule does not apply):

> The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical *invasion* is a taking. As *PruneYard Shopping Center v. Robins [*447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)]; *Kaiser Aetna v. United States [*444 U.S. 164, 100 S.Ct. 383; 62 L.Ed.2d 332 (1979)]*, and the intermittent flooding cases reveal, such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

*Id.* at 435 n. 12, 102 S.Ct. 3164 (internal citations omitted).

As noted above, Boise contends that the district court's injunction worked a per se taking under *Loretto* based on the taking of its so-called right to exclude owls by logging, and based on the requirement that it allow the Service to conduct owl surveys during the pendency of the preliminary injunction. We turn first to the alleged taking of an "owl easement" across Boise's property.

As an initial matter, Boise is incorrect to suppose that the district court's injunction

was responsible for taking its right to exclude spotted owls. The ESA itself precludes Boise from harassing, harming, pursuing, wounding, or killing spotted owls, 16 U.S.C. §§ 1532(19), 1538(a)(1) (2000). Boise lost whatever right it had to "exclude" the owls nesting on its land when they were listed as a threatened species under the ESA. The injunction, therefore, did not take whatever remained of this putative property interest; it merely prevented Boise from logging its land without a permit, which—as a regulation imposed upon Boise's use of the property—is a restriction on private use of the land and not a per se taking by the government.

We are not the first court to analyze the merits of this argument. Boise also sued the State of Oregon in state court for compensation based on the logging ban imposed by ODF while the mating pair of owls occupied the Walker Creek Unit. In its complaint, Boise "alleged that the administrative rules ... required plaintiffs to maintain spotted owl nests and prevent their abandonment so the nests could be occupied annually by a pair of breeding owls and that the state's denial of plaintiff's plan to harvest the timber constituted a *per se* taking." *Boise Cascade Corp. v. State ex rel Oregon State Bd. of Forestry,* 164 Or.App. 114, 991 P.2d 563, 569 (1999). Although the Oregon court held that the regulatory takings claims should proceed to trial,[10] it rejected Boise's *Loretto* claim on the pleadings. *Id.* The court reasoned that

> [T]here are significant differences between a government authorizing or conducting a physical invasion of the property of another and a government regulating what one may do with prop-

erty due to the random or incidental location of a natural resource or wild animal on the property. The state has no control over where spotted owls choose to nest. The natural occurrence of a pair of breeding spotted owls on a piece of property is more akin to the naturally occurring flood ... than to a flood caused by the government's construction of a dam, as was the case in *Pumpelly* [*v. Green Bay Co.,* 80 U.S. (13 Wall) 166, 20 L.Ed. 557 (1871)], or to the installation of an artificial structure such as a cable television box, as was the case in *Loretto.*

> The state did not cause or induce the spotted owls to breed on plaintiff's property. The state simply regulated plaintiff's use of the property based on the presence of the spotted owls there. Although plaintiffs have stated a claim for a regulatory taking, they have not stated a claim for a "physical occupation" taking under *Loretto.*

*Id.* at 570.

We agree with the Oregon Court of Appeals that Boise's argument is merely an attempt to convert a regulatory takings claim, governed by *Penn Central* (and in this case barred by the ripeness doctrine of *Riverside Bayview* and *Tabb Lakes*) into a per se taking governed by the more generous rule of *Loretto.* Boise claims that application of *Loretto* is appropriate here because it views occupation by wild spotted owls as indistinguishable from a forced government intrusion upon its land. These two situations are, however, very different. The government has no control over where the spotted owls nest, and it did not force the owls to occupy Boise's

---

10. The ODF had actually rejected Boise's proposed timber harvest plan—its permit application—which gave rise to a ripe regulatory takings claim against the state.

land. The government simply imposed a temporary restriction on Boise's exploitation of certain natural resources located on its land unless Boise obtained a permit. As explained above, that the Service never denied Boise's permit—and in fact lifted the permit requirement—is fatal to Boise's regulatory takings claims, and it remains fatal notwithstanding Boise's attempt to recharacterize those claims as a forced physical occupation by owls.

Boise also claims a per se taking based on the requirement that it allow government officials to enter its land to conduct owl surveys. This particular requirement was only part of the preliminary injunction and was therefore in effect from April 1, 1998, until August 31, 1998—five months. Specifically, the court granted the government's motion for a preliminary injunction prohibiting logging "until this litigation concludes and for permission to survey for spotted owls until August 31, 1998." The permanent injunction did not authorize the government to enter Boise's land without Boise's permission.

Under a plain reading of *Loretto*, Boise cannot claim that the government's brief intrusions onto its land to conduct owl surveys constitute a per se taking. Transient, nonexclusive entries by the Service to conduct owl surveys do not permanently usurp Boise's exclusive right to possess, use, and dispose of its property. The government's incursion into Boise's property is more in the nature of a temporary trespass—though, obviously, sanctioned by the district court and therefore not unlawful—rather than a permanent physical occupation or an easement of some kind.

However, Boise contends that in *Hendler v. United States*, 952 F.2d 1364 (Fed.

Cir.1991), we interpreted *Loretto* very broadly to include temporary incursions like those at issue here. In *Hendler*, the plaintiff landowners sued in the Court of Federal Claims for compensation after the government, acting under the EPA's authority granted by CERCLA,[11] sunk concrete wells on their property to monitor groundwater pollution from a nearby superfund site. *Id.* at 1367. The trial court dismissed the landowners' takings claims, and we reversed. We held that the wells, and the government workers who entered to install, maintain, and monitor them permanently occupied the plaintiffs' land and therefore gave rise to a per se taking under *Loretto*. *Id.* at 1377. Our decision in *Hendler* rested squarely upon the permanent nature of the wells and the regular government intrusions to monitor them. We noted that

> [t]here is nothing "temporary" about the wells the Government installed on plaintiffs' property. . . . Years have passed since the government installed the first wells. The wells are some 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement. Each well was capped with a cement casing lined with reinforcing steel bars, and enclosed by a railing of steel pipe set in cement. These surveillance wells are at least as "permanent" in this sense as the CATV equipment in *Loretto*.

*Id.* at 1376. The permanency of the wells and the quasi-permanent right of entry provided to the government workers who monitored and maintained them led us to apply the per se takings theory of *Loretto*.

The government intrusion complained of in this case was of far lesser duration than

---

11. The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–57 (1994).

that in *Hendler*, and it did not involve the placement of a permanent or even a quasi-permanent installation on Boise's property. In *Hendler*, the government entered the land and placed upon it what were essentially permanent wells—wells that it intended to actively monitor over the years. Here, in contrast, the Service briefly entered the land over a period of five months in order to conduct owl surveys needed for the resolution of a lawsuit initiated by Boise. The Service was not authorized to make, and did not make, any permanent incursion on Boise's land. Boise does not argue that the surveyors added any kind of permanent (or even temporary) addition to the landscape of the Walker Creek Unit. Boise nevertheless contends that the Service's intrusion satisfies the definition of "permanent" given in *Hendler*, and that the *Loretto* per se rule therefore applies.

Boise's argument rests on a portion of *Hendler* in which the court, discussing *Loretto*'s permanency requirement, noted that "[i]n this context, 'permanent' does not mean forever, or anything like it. A taking can be for a limited term—what is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute."

*Id.* Boise's argument based on this dicta in *Hendler* is not novel. The language quoted above has been widely misunderstood and criticized as abrogating the permanency requirement established by the Supreme Court in *Loretto*.[12]

Obviously this court is without power to abrogate the law established by the Supreme Court, and *Hendler* does not purport to do so. Language such as this must be read in context. And in context, it is clear that the court merely meant to focus attention on the *character* of the government intrusion necessary to find a permanent occupation, rather than solely focusing on temporal duration. Thus, *Hendler*'s statement regarding permanency was followed by three illustrative examples, drawn from prior Supreme Court cases, of per se takings due to complete physical occupations of estates of lesser temporal duration than a fee simple absolute. In two of those cases, *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), and *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946), the government acquired the remainder of a leasehold interest through a judicial condemnation proceeding. In the third, *Kimball Laundry Co. v. United States*, 338 U.S. 1,

---

12. In *Juliano v. Montgomery–Otsego–Schoharie Solid Waste Management Authority*, 983 F.Supp. 319, 327 (N.D.N.Y.1997), for instance, a district court called upon to apply *Loretto* to "strikingly similar" facts as those of *Hendler* noted that "[s]emantics aside, what the *Hendler* court has done, in essence, is to completely emasculate *Loretto*'s requirement of permanency." The court also opined that "[t]he Hendler court's creative use of language calls to mind Lewis Carroll's famous passage:

"When I use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you can make words mean so many different things."

*Id.* at 327 n. 7 (quoting Lewis Carroll, *Through the Looking Glass* 163). *See also* David F. Coursen, *The Takings Jurisprudence of the Court of Federal Claims and the Federal Circuit*, 29 Envtl. L. 821, 832 (1999) (describing *Hendler* as "seriously flawed" and "problematic substantively, in part at least for the mechanistic way it extends categorical analysis to conclude that a permanent physical occupation, and therefore a taking, had occurred, without really requiring that the taking be permanent").

69 S.Ct. 1434, 93 L.Ed. 1765 (1949), the United States acquired, via condemnation, a laundry plant for a term of years (renewable at the discretion of the Secretary of War) during World War II. The property owner in *Kimball* was completely displaced, and his business was run by the Quartermaster Corps as a laundry service for the Seventh Service Command. *Id.* at 3, 69 S.Ct. 1434. In none of these cases did the government permanently (in a temporal sense) occupy the property. Nevertheless, they involved total occupation of the property by the government, and therefore all three cases were per se takings where the only dispute concerned the amount of compensation to be paid to the displaced owner.

Putting its dicta to one side, *Hendler*'s holding was unremarkable and quite narrow: it merely held that when the government enters private land, sinks 100–foot deep steel reinforced wells surrounded by gravel and concrete, and thereafter proceeds to regularly enter the land to maintain and monitor the wells over a period of years, a per se taking under *Loretto* has occurred. The facts of *Hendler* were well within the limited parameters of the per se rule delineated by the *Loretto* Court for, as we stated in *Hendler,* the "wells are at least as 'permanent' . . . as the CATV equipment in *Loretto.*" *Hendler,* 952 F.2d at 1376. Thus, Boise is incorrect to suppose that *Hendler* compels us to turn a transient invasion by owl surveyors into a per se taking under *Loretto.* Like the trial court, we hold that the extremely limited and transient nature of the intrusion in this case, coupled with its purpose, which was to discover information necessary to the adjudication of a case that Boise itself initiated, preclude a finding that a taking occurred as a matter of law.

### III

For the reasons given above, we conclude that Boise cannot make out a ripe takings claim based on the mere imposition of a permitting requirement, and that it has not alleged facts sufficient to support a per se takings claim under *Loretto* as a matter of law. We therefore affirm the judgment of the Court of Federal Claims in its entirety.

### COSTS

No costs.

*AFFIRMED*