Marsha SEIBER and Alvin Seiber, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 01–432L.

United States Court of Federal Claims.

Sept. 4, 2002.

Phillip D. Chadsey, Stoel Rives, LLP, Portland, Oregon, for plaintiffs.

Dorothy R. Burakreis, General Litigation Section, Environmental and Natural Resources Division, U.S. Department of Justice, Washington, D.C., Diane Hoobler, Office of the Solicitor General, U.S. Department of the Interior, of counsel, for defendant.

## *OPINION*

MARGOLIS, Senior Judge.

This takings action is before the Court on defendant's motion to dismiss or, alternatively, for summary judgment, and on plaintiffs' cross-motion for partial summary judgment

on the issue of liability. After carefully considering the parties' motions and after a hearing in court, defendant's motion for summary judgment is granted as to all Counts. Plaintiffs' cross-motion for partial summary judgment is denied.

### FACTS

Plaintiffs, Marsha and Alvin Seiber, own approximately 200 acres of land in Linn County, Oregon, on which they both live and conduct their logging business. Of this property, 185 to 190 acres are commercial timberlands. Forty acres of those commercial timberlands were designated by Oregon as northern spotted owl nesting habitat from 1994 to June 2002 and were thus protected from harvesting. Because the 40 acres were designated northern spotted owl nesting habitat by Oregon, the United States government, acting through the U.S. Fish and Wildlife Service (FWS), denied plaintiffs' application for a permit to cut timber on the property. As a result, plaintiffs claim that those 40 acres of timber were temporarily taken by the government, requiring just compensation pursuant to takings theories under *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); and, *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

In June 1990, FWS designated the northern spotted owl a threatened species under the Endangered Species Act. Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Northern Spotted Owl, 55 Fed.Reg. 26,114 (June 26, 1990). Pursuant to this designation, the Oregon Department of Forestry (ODF) implemented state regulations aimed at protecting northern spotted owl nesting sites. The ODF regulations prohibited logging within a 70–acre area of a northern spotted owl nesting site. In 1994, Oregon designated a 70–acre area, 40 acres of which were on plaintiffs' property, as northern spotted owl nesting habitat. The remaining 30 acres are on plaintiffs' neighbors' property.

In February 1998, plaintiffs submitted a logging application to ODF seeking approval to harvest the 40–acre protected area. Under Oregon law, parties conducting commercial harvests in Oregon must file a notification with ODF announcing their intent to harvest the timber. *See generally,* ORS § 527.670 (1994). ODF refused to approve plaintiffs' harvesting plan, and on appeal the Oregon Board of Forestry affirmed the denial. The Oregon regulation protecting northern spotted owl nesting sites, however, contains an exception that permits logging of the protected sites, *i.e.,* the landowner acquires an incidental take permit for northern spotted owls from FWS.[1] The Endangered Species Act provides a detailed process by which a person may obtain a permit to engage in the incidental take of a protected species.[2] 16 U.S.C. § 1539(a). Thus, plaintiffs applied to FWS for an incidental take permit.

On November 26, 1999, plaintiffs submitted to FWS an incidental take permit application along with a habitat conservation plan, as required by the Endangered Species Act, 16 U.S.C. § 1539(a)(2)(A).[3] The application re-

---

**1.** Under the Endangered Species Act, the "take" of an endangered species is prohibited unless authorized by regulation or permit. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined under the Endangered Species Act as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" in the definition of "take" means any act which actually kills or injures protected wildlife and "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

**2.** Incidental take of a species means "any taking otherwise prohibited, if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 50 C.F.R. § 17.3.

**3.** The Endangered Species Act, 16 U.S.C. § 1539(a)(2)(A), requires that an incidental take permit applicant submit a habitat conservation plan, which specifies among other things the impacts likely to result from a taking, as well as the measures the applicant plans to take in order to minimize and mitigate those impacts.

quested authorization to take the northern spotted owl by logging 40 acres of a 70–acre area designated by Oregon as a spotted owl core area, *i.e.*, protected habitat. Plaintiffs expected that their habitat conservation plan would be considered a low-effect habitat conservation plan and as such processed within three months. FWS, however, determined that the habitat conservation plan was not low effect and thus required an Environmental Assessment, which results in a longer processing period.

In a February 7, 2000 letter, the Department of the Interior's Regional Solicitor informed plaintiffs that their incidental take permit application lacked much of the "biological analysis and information routinely provided by other applicants." Def's App. at 125. The Solicitor stated that FWS was willing to work with plaintiffs to discuss incidental take permit application modifications that would allow for expedited processing. In a February 9, 2000 response to the Regional Solicitor, plaintiffs' attorney stated that plaintiffs had no desire to discuss modifications to their incidental take permit application.

FWS denied plaintiffs' application in a July 6, 2000 letter. The letter stated that the Oregon Forest Practices Act regulations, upon which the habitat conservation plan solely relied, are not a sound biological rationale for mitigating and minimizing spotted owl take. With respect to the first mitigation measure in plaintiffs' habitat conservation plan, FWS stated that harvesting outside of the nesting season may minimize harm to currently nesting owls, but did not minimize or mitigate the incidental take resulting from removal of owl nesting habitat. In addition, FWS stated that plaintiffs' proposed alternative did not provide replacement habitat, nor did it provide dispersal habitat, which would allow owls to migrate through the area in the process of locating mates and nesting sites. FWS ultimately determined that

> [t]he net result is that there is essentially no mitigation being provided for the incidental take of spotted owls associated with the harvest of suitable habitat within close proximity to a nesting location. The incidental take would be either in the form of abandonment of the nest site, thus precluding future breeding, or loss of foraging and roosting opportunities which would decrease the likelihood for spotted owls to survive and successfully reproduce in the area.

*Id.* at 135, 98 S.Ct. 2646.

FWS stated that although the application was denied there were other approvable alternatives available. It provided examples of two habitat conservation plans from similarly situated landowners that resulted in issuance of incidental take permits and suggested alternatives under which FWS believed plaintiffs would be issued an incidental take permit. The alternatives, which FWS noted were not comprehensive, were described in full in the July 6, 2000 letter and summarized in a September 28, 2001 letter: 1) selective harvest of the 40 acres to maintain spotted owl habitat; 2) harvest that eliminates suitable habitat for a period of time, but with a commitment to regenerate and maintain some level of suitable habitat in the future; 3) harvest alternatives that manage the entire property as a unit; and 4) harvest alternatives only outside the 40 identified acres, with the 40 acres serving as mitigation. In each letter that FWS sent to plaintiffs' attorney, FWS reiterated its offer of assistance in helping plaintiffs find a suitable and approvable alternative.

On July 28, 2000, plaintiffs requested reconsideration of the application denial. Reconsideration was denied, and plaintiffs appealed to the Regional Director of FWS. The appeal was denied on November 9, 2000. Plaintiffs then brought suit in this Court. Pursuant to this Court's direction, FWS visited plaintiffs' property in order to evaluate changes that had occurred on the property since plaintiffs originally submitted their incidental take permit application. Following the visit and upon noting several changes, FWS sent a June 3, 2002 letter to plaintiffs' attorney, stating that an incidental take permit is no longer required to log the property. Plaintiffs subsequently informed this Court at oral argument that despite the fact that the permit is no longer required, plaintiffs still consider their four claims valid, *i.e.*, that

they are now asserting temporary takings claims rather than permanent takings claims.

## DISCUSSION

Plaintiffs moved for summary judgment on Counts 1 and 2 of the complaint. Summary judgment is appropriate when there are no disputed genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Defendant moved for dismissal of Counts 1, 2, and 3 for failure to state a claim under RCFC 12(b)(4) or, in the alternative, for summary judgment under RCFC 56 on all Counts. Dismissal under RCFC 12(b)(4) occurs when the facts, as asserted by the claimant, do not entitle him to a remedy under the law. *Spehr v. United States*, 51 Fed.Cl. 69, 91 (2001). However, a motion to dismiss for failure to state a claim shall be treated as one for summary judgment if matters outside the pleadings are presented to and not excluded by the court. RCFC 12(b). Thus, because outside pleadings were presented and not excluded by this Court, defendant's motion to dismiss shall be treated as an RCFC 56 motion for summary judgment.

The Fifth Amendment provides, in pertinent part, that private property shall not be taken for public use, without just compensation. U.S. Const. amend. V. There are generally three types of takings: "a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 430, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In order to prevail on a taking claim, the claimant must first establish a valid property interest in the property affected by the governmental action. *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed.Cir. 2002).[4] Once the claimant has proven a valid property interest, he or she must then show that the government action at issue constituted a taking of that interest. *Id.* Because the government does not contest that plaintiffs possess a property interest in both its fee simple estate and in ownership of the timber growing on the property, this Court may proceed to the issue of whether the government's action constituted a taking. *See id.*

### 1. Ripeness of Plaintiffs' Claims

Courts may only address issues that are ripe for decision. *See generally Cristina Inv. Corp. v. United States*, 40 Fed.Cl. 571, 578 (1998). Where the issue is not ripe, the court lacks jurisdiction to hear the issue. *See Loveladies Harbor, Inc. v. United States*, 15 Cl.Ct. 381, 385 (1988). In this Court, "[a]ll that is necessary to ripen a federal takings challenge of this kind is a final decision from the government...." *Id.* The party asserting jurisdiction has the burden of demonstrating that jurisdiction exists, and the Court may consider relevant evidence in order to resolve the jurisdictional dispute. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747–48 (Fed.Cir.1988).

Defendant originally based its motion in part on an assertion that the case was unripe, thereby precluding this Court's jurisdiction to hear the case. Defendant asserts that because the agency had not issued a final decision with respect to a permit grant or denial, plaintiffs' claim was not ripe. While plaintiffs' takings claim has changed from one of a permanent taking to a tempo-

---

**4.** *Boise Cascade Corp. v. United States* is a similar case to the one at hand. In that case, plaintiff was enjoined by a district court from logging certain property without an incidental take permit from FWS. *Boise Cascade Corp.*, 296 F.3d at 1342. Plaintiff applied for an incidental take permit, but before a decision was rendered, FWS lifted the permit requirement from the property. *Id.* at 1342. Plaintiff then brought suit in the United States Court of Federal Claims alleging a temporary taking of its merchantable timber due to the district court's injunction based on the same four theories asserted in this case. *Id.* The Court of Federal Claims held that the takings claim was not ripe because plaintiff had not been denied a permit, but was merely enjoined from logging without one. *Id.* at 1343. The Court of Federal Claims also denied plaintiff's *Loretto* claim because there was no forced governmental intrusion and thus no physical taking. *Id.* at 1343. Upon appeal, the United States Court of Appeals for the Federal Circuit affirmed the lower court's decision in its entirety. *Id.* at 1357.

rary taking in light of FWS's letter indicating that an incidental take permit is no longer required to log plaintiffs' property, the ripeness issue continues to directly affect plaintiffs' claim. The Federal Circuit recently held that a taking does not ripen until a permit is applied for and denied. *Boise Cascade Corp.*, 296 F.3d at 1351–52. "If the government denies a permit, then the aggrieved party can seek compensation." *Id.* at 1347. Further, if the government subsequently reconsiders the denial and grants the permit or revokes the permit requirement, the aggrieved party can seek compensation for a temporary taking. *Id.*

The holdings in *Boise Cascade* hinge on the assumption for a claim to be ripe, that a permit denial must be a final agency decision. A regulatory takings claim is not ripe until the agency implementing the regulations has reached a final decision regarding application of the regulations to the property at issue. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). "Such a decision generally will not be considered final if the government has the discretion to consider a modified plan, but the applicant has not asked the government to exercise that discretion." *Cristina Inv. Corp.*, 40 Fed.Cl. at 579. In the present case, the plaintiffs submitted an application for an incidental take permit. FWS denied the permit based on its finding that plaintiffs' proposed minimization and mitigation efforts were inadequate to protect the northern spotted owl. FWS stated in its July 6, 2000 letter that although the permit was denied, several approvable alternatives were available. In addition, FWS included examples of two applications that were approved for permits, outlined specific criteria under which FWS felt a permit would be issued to plaintiffs, and offered assistance in creating an approvable permit application on numerous occasions. Thus, because FWS had the discretion and an indicated willingness to consider a modified plan, but plaintiffs did not ask the government to exercise that discretion, the initial permit denial was not a final decision by FWS with respect to application of logging regulations to plaintiffs' property. Plaintiffs' temporary takings claim based on permit denial is therefore unripe, and this Court lacks jurisdiction to entertain the claim.

### 2. *Physical Takings Claim Under the Loretto Case*

Even if plaintiffs' claims were ripe, plaintiffs would not prevail on the merits. Count 1 of plaintiffs' claim for relief asserts a physical taking by imposition of a servitude upon the property requiring that the merchantable timber be left standing. As such, plaintiffs rely on *Loretto*, which established the law with respect to a permanent physical occupation of private property by the government. *Loretto*, 458 U.S. at 421, 102 S.Ct. 3164. In that case, the United States Supreme Court distinguished between the three types of takings. *See generally id.* at 426–38, 102 S.Ct. 3164. The Supreme Court specifically affirmed the traditional rule that a permanent physical occupation of property is a taking. *Id.* at 441. In so holding, the Supreme Court was not questioning "the equally substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's *use* of his property." *Id.* The *Loretto* decision is quite narrow and applies *only* to permanent physical occupations by the government. *Boise Cascade Corp*, 296 F.3d at 1353.

The Supreme Court described physical property rights as the rights "to possess, use and dispose" of property. *Loretto*, 458 U.S. at 435, 102 S.Ct. 3164. It further stated that "[t]o the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights." *Id.* Accordingly, where a permanent physical taking takes place, the property owner is deprived of both his right to possess the occupied space himself as well as his right to exclude the occupier from possession and use of the property. *Id.* A permanent physical occupation also "forever denies the owner any power to control the use of the property." *Id.* at 436, 102 S.Ct. 3164. Finally, although the owner may technically retain the right to sell or transfer the property, this right is essentially rendered void of any value as the future owner will also be deprived of

the ability to make any use of the property. *Id.* A physical occupation is a permanent and exclusive occupation by the government that destroys all three of those rights. *Boise Cascade Corp.,* 296 F.3d at 1353.

In its recent decision in *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), the Supreme Court reiterated the distinction between a physical taking and a regulatory taking, stating that a physical taking "gives the government possession of the property, the right to admit and exclude others, and the right to use it for a public purpose." *Id.* at 1480 n. 19.[5] The Supreme Court contrasted a regulatory taking as a taking that "does not give the government any right to use the property, nor does it dispossess the owner or affect her right to exclude others." *Id.* The Supreme Court also stated that this longstanding distinction makes it inappropriate to treat cases addressing physical takings as controlling precedents for regulatory takings cases and vice versa. *Id.* at 1480.

■ Plaintiffs allege that the government's physical occupation of their property constitutes a taking under *Loretto.* In support of their argument, plaintiffs state that the government's actions permit occupation of the property by the northern spotted owl and deny plaintiffs the right to exclude the northern spotted owl. However, this argument does not satisfy the standard laid out in *Loretto* and was recently rejected by the United States Court of Appeals for the Federal Circuit. *Boise Cascade Corp.,* 296 F.3d at 1353–54. First, plaintiffs fail to show how their cohabitation with the northern spotted owl deprives them of their right to possess the property themselves or how they are prevented from excluding others. Second, plaintiffs do not claim that the government's alleged occupation "forever denies [plaintiffs] any power to control the use of the property...." *Loretto,* 458 U.S. at 436, 102 S.Ct. 3164. Rather, plaintiffs state only that the

government is preventing them from logging the property, but do not assert that they are prevented from otherwise controlling their property and using it for other means. However, plaintiffs have been harvesting other sections of their property throughout this process. June 6, 2002 Tr. at 20. Third, plaintiffs do not claim that the government has permanently deprived them of the right to dispose of the property or that the government's action has emptied that right of any value. *See id.* The facts asserted by plaintiffs do not entitle them to a remedy under *Loretto.* Plaintiffs, therefore, have failed to state a permanent physical taking claim.

### 3. Regulatory Taking Claim Under the Lucas Case

■ In its regulatory takings jurisprudence, the Supreme Court has generally avoided establishing a set formula for determining when a regulation has gone too far, instead preferring to engage in *ad hoc,* factual inquiries. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Tahoe–Sierra,* 122 S.Ct. at 1480–81. However, there are two types of regulatory actions that the Supreme Court deemed compensable without case-specific inquiry into the public interest advanced in support of the regulation: physical invasions of property and "the relatively rare situations where the government has deprived a landowner of all economically beneficial" or productive use of the land. *Lucas,* 505 U.S. at 1015–16, 1018, 112 S.Ct. 2886. "[W]hen the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at 1019, 112 S.Ct. 2886.

In order to analyze whether the property is taken by a government regulation, a court must first determine what property interest is at stake. *M & J Coal Co. v. United States,*

**5.** In *Tahoe–Sierra,* 122 S.Ct. at 1477–78, the Supreme Court distinguished between a general physical taking and a regulatory taking for purposes of its decision. However, that distinction does not replace the more detailed analysis required by the Supreme Court under *Loretto.* The

Supreme Court in *Loretto* went further in its discussion and distinguished between a mere physical taking that falls short of a physical occupation and a permanent physical occupation, which require different tests. *Loretto,* 458 U.S. at 430, 102 S.Ct. 3164.

47 F.3d 1148, 1154 (Fed.Cir.1995) (establishing a two-part test for analyzing regulatory takings). To do so, the court may need to assess "how the owner's reasonable expectations have been shaped by the State's law of property—*i.e.*, whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land...." *Lucas*, 505 U.S. at 1016 n. 7, 112 S.Ct. 2886. If a property interest is established, then the court may determine whether the government action resulted in a compensable taking of that interest. *M & J Coal Co.*, 47 F.3d at 1154.

Plaintiffs claim that the government prevented them from logging 40 acres of their property during the period in which plaintiffs were attempting to obtain an incidental take permit, thereby effecting a temporary taking of their property. Plaintiffs assert that this was a categorical taking under *Lucas* because under Oregon law the 40 acres are a property interest separate and distinct from the remaining 160 acres they own. As such, they state that because the 40 acres are a separate property interest and because the government temporarily precluded them from logging any part of that 40 acres, thereby allegedly depriving them of all economically beneficial or productive use of that land, a *Lucas* taking occurred.

Under Oregon law, plaintiffs' timber may be considered a property interest separate from the land on which the timber grows. *Cf. Hawkins v. City of La Grande*, 315 Or. 57, 843 P.2d 400, 407 (1992) (holding that destroyed crops, although growing from land, are a separate entity). However, for plaintiffs to prevail on a taking claim under *Lucas*, this Court must find that the 40 acres of timber are a property interest separate from the remaining 145–150 acres of commercial timberland. In determining whether this claim was properly asserted, this Court can look to the pleadings and admissions on file. *See* RCFC 12(b), 56(c).

There is no dispute over the fact that the 40 acres were originally designated protected northern spotted owl nesting habitat. However, in light of plaintiffs' statements in court,

those 40 acres did not contain the only merchantable timber on the property at the time. Plaintiffs recently harvested 15 acres on another portion of their property and are currently in the process of logging about 25 additional acres also on their property. June 6, 2002 Tr. at 20; June 3, 2002 FWS ltr. at 1. As a result, this Court finds that the 40 acres of timber, while possibly a separate interest from the underlying land, are not a separate property interest apart from other acreage containing merchantable timber. Thus, because the 40 acres alleged to be taken were not 100% of the timber interest, and therefore, plaintiffs' land did not lose *all* economically viable or beneficial use of that interest, plaintiffs' *Lucas* claim fails.

### 4. *Regulatory Taking Claim Under the Agins Case*

Although this Court holds plaintiffs' temporary takings claim to be unripe, this Court will analyze that claim.[6] "Temporary takings are not different in kind from permanent takings." *Wyatt v. United States*, 271 F.3d 1090, 1097 n. 6 (Fed.Cir.2001) (citing *First English Evangelical Lutheran Church v. L.A. County, Calif.*, 482 U.S. 304, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). A temporary taking occurs when what would otherwise be a permanent taking is cut short. *Id.* "The essential element of a temporary taking is a finite start and end to the taking." *Id.*

In conducting a regulatory taking analysis, the court must conduct "essentially ad hoc, factual inquiries." *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S.Ct. 2646. "[W]hether a landowner has been deprived of all economically viable use of his property is a predominantly factual question." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 720, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). What that inquiry entails has not been delineated by the Supreme Court, but the Court has stated that regardless of the relevant factors, the parcel must be focused on as a whole. *Tahoe–Sierra*, 122 S.Ct. at 1480–81.

---

6. Plaintiffs informed this Court in a telephonic status conference that they abandoned their temporary taking claim under *Agins*, but then reasserted the claim at oral argument.

There are a number of factors that may be considered in evaluating whether a regulatory taking has occurred. A court should determine whether the regulation allegedly effecting a taking substantially advances a legitimate government interest or denies an owner economically viable use of his land. *Agins,* 447 U.S. at 260, 100 S.Ct. 2138. Courts have also considered the economic impact of the regulation on the property owners, the extent to which the regulation has interfered with the property owners' investment-backed expectations, the character of the government action, *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646, and the length of delay in the regulatory process, *see Wyatt,* 271 F.3d at 1097–98; *Walcek v. United States,* 44 Fed.Cl. 462, 467 (1999).

Plaintiffs' original claim under *Agins* was that the government's refusal to grant plaintiffs an incidental take permit did not substantially advance a legitimate government interest and therefore constituted a taking. Plaintiffs assert that because the government designated only federal lands as "critical habitat" for the northern spotted owls, its denial of a permit on private property did not advance the government's interest in protecting the owl. The government points out that the final rule establishing critical habitat for the spotted owl stated that other areas not so designated may be important to owl conservation and may be addressed under other Endangered Species Act provisions. Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Northern Spotted Owl, 57 Fed.Reg. 1796 (Jan. 15, 1992). Regardless, plaintiffs do not assert that the government's interest in protecting the northern spotted owl is not legitimate. Plaintiffs also do not claim that the government's permit process does not substantially advance the legitimate interest in protecting the owl. Rather, plaintiffs claim that the interest in protecting the owl was not "sufficient to cause" the government to designate private lands as critical habitat.

Plaintiffs also claim under *Agins,* that they were denied economically viable use of their property throughout the permit process because their property was worthless during that time. However, according to the Supreme Court, "a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." *Tahoe–Sierra,* 122 S.Ct. at 1484. This statement does not mean that the full value must be recovered to avoid a taking; rather, some value must be recovered. As such, plaintiffs do not state a claim under *Agins.*

Additionally, at oral argument plaintiffs asserted a taking because timber prices have declined and some timber on their property lost value due to root rot. A temporary restriction that merely causes a diminution in value does not constitute a taking of the "parcel as a whole." *Tahoe–Sierra,* 122 S.Ct. at 1484. "Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.'" *Agins,* 447 U.S. at 263 n. 9, 100 S.Ct. 2138 (quoting *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 84 L.Ed. 240 (1939)). Here, the loss in timber value is an incident of ownership and not a basis for a taking claim. Therefore, plaintiffs' assertion that their property was rendered temporarily worthless and that it lost value does not support their taking claim.

While plaintiffs did not allege in their complaint that the permit process resulted in a temporary taking, the Court will address that issue as plaintiffs raised it in oral argument. "A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 127, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). "[A] taking may occur by reason of 'extraordinary delay in governmental decisionmaking.'" *Wyatt,* 271 F.3d at 1098 (quoting *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 803 (Fed.Cir.1993)). However, "absent denial of the permit, only an extraordinary delay in the permitting process can give rise to a compensable taking." *Boise Cascade Corp.,* 296 F.3d at 1349. The length of the delay is often not the primary factor. For a delay to be extraordinary, the delay

must be substantial and is usually accompanied by a showing of bad faith. *Wyatt*, 271 F.3d at 1098. Where governmental agencies are implementing complex permitting schemes that require detailed information before issuance of a permit, the agencies should be afforded significant deference in determining what information is required to satisfy the permit process. *Id.* In addition, delay in the permitting process may also be attributed to the applicant. *Id.*

Plaintiffs did not allege and have not presented any evidence of bad faith or negligence on the part of the government. Plaintiffs merely claim that the permit process took too long, and therefore a taking resulted. It is undisputed that the plaintiffs were unwilling to discuss their application and possible modifications with FWS during the permitting process. In light of the uncontroverted facts in this case and the absence of any showing of bad faith by the government, this Court finds that the permit process in this case did not constitute a temporary taking of plaintiffs' property.

### 5. *Regulatory Taking Claim Under the Penn Central Case*

■ Plaintiffs assert a regulatory taking claim under *Penn Central Transportation Co.*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631. In that case, the Supreme Court noted three factors that have particular significance in a regulatory takings analysis: 1) "[t]he economic impact of the regulation on the claimant," 2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and 3) "the character of the governmental action." *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646. Again, the focus must be on the "parcel as a whole." *Id.* at 130–31, 98 S.Ct. 2646. Plaintiffs assert that the three factors are satisfied to the extent that a taking occurred in that 1) the economic impact on plaintiffs was the loss of "a couple hundred thousand dollars" by virtue of not being able to harvest the timber; 2) plaintiffs had a reasonable investment-backed expectation that they would be able to harvest the timber for their own use; and 3) the government "confiscated 40 acres of plaintiffs' timber for its own purposes." Pls'

Reply at 18. Plaintiffs bolster their claim of adverse economic impact by claiming that they were "barred from deriving any income from a substantial portion of their land." *Id.* However, in light of the fact that the government no longer requires a permit to log the 40 acres, plaintiffs are now in a position to log the timber for an economic gain and realize their alleged investment-backed expectation. *See Tahoe–Sierra*, 122 S.Ct. at 1481–82. In addition, as plaintiffs note, they have been logging and deriving income from other portions of their property all along.

Likewise, plaintiffs cannot assert that they lost value on their property as this was an alleged temporary taking that has ended. That they were unable to realize income from the timber for a period of one year due to a reasonable permitting process is an incident of ownership. At the same time, the alleged taking apparently did not affect plaintiffs' property as a whole, as they were able to log 15 acres and were planning before the permit requirement was lifted to log 25 more on another area of their property. Thus, even if plaintiffs were able to prove that the 40 acres were taken, it would not have been a compensable taking because plaintiffs' property interest as a whole was not impacted to the extent required by *Agins* or *Penn Central*. Ultimately, plaintiffs' property was not rendered valueless by the permitting process regulations because now that the permit requirement is lifted, the timber is able to be logged, and the property has thus regained its value.

Finally, plaintiffs claim that they were singled out to bear the burden of protecting the northern spotted owl when the burden should have been borne by the public as a whole. In *Penn Central*, while the Supreme Court recognized that the Fifth Amendment guarantee was designed to prevent the government from forcing some people alone to bear public burdens, the Court upheld New York City's landmark and historic district law that applied only to selected parcels. 438 U.S. at 123, 98 S.Ct. 2646. The Court explained that unlike discriminatory zoning, which arbitrarily singles out a particular parcel for different, less favorable treatment from its neighbors, New York City's land-

mark law embodied a comprehensive plan designed to preserve landmarks and historical districts. *Id.* at 132, 98 S.Ct. 2646. In addition, the Court pointed out that numerous properties had come under this plan. *Id.* In the instant case, the government created a similarly comprehensive plan, through the Endangered Species Act, designed to preserve and protect threatened species, including the northern spotted owl. As in *Penn Central,* several properties have come within the plan's restrictions. Thus, plaintiffs' property was not arbitrarily singled out, nor was plaintiffs' property the only parcel to have been affected by Endangered Species Act regulations. Therefore, plaintiffs are not individually bearing the burden imposed by the Endangered Species Act. Additionally, this Court considered plaintiffs' other arguments and finds them without merit.

### CONCLUSION

For the foregoing reasons, this Court grants defendant's motion for summary judgment as to all Counts. Plaintiffs' cross-motion for partial summary judgment is denied. The Clerk shall dismiss the complaint. Costs for defendant.