**Robert E. MORRIS and Carol L. Morris, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 02–1406L.**

United States Court of Federal Claims.

Sept. 26, 2003.

Jan David Breemer, Sacramento, California, attorney of record for plaintiff.

William James Shapiro, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Thomas L. Sansonetti, for defendant.

Dawn Andrews McIntosh, United States Department of Commerce, of counsel.

### OPINION

FUTEY, Judge.

This case comes before the court on defendant's motion for judgment on the pleadings. Plaintiffs allege that they are restricted by the National Marine Fisheries Service (NMFS), acting pursuant to the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544 (1988), from cutting down a small number of trees for personal use, which are located on their half-acre property. This restriction, argue plaintiffs, is a taking of private property for public use without just compensation in violation of the Fifth Amendment of the United States Constitution.

Defendant counters that plaintiffs' claim is not ripe for review by the court and, therefore, must be dismissed. Defendant's main argument is that no action can be brought

until an Incidental Take Permit (ITP) is sought from the NMFS, allowing the agency to make a final agency decision to permit or prohibit plaintiffs from cutting down the trees they seek to use. Only the ripeness question, and not the merits of plaintiffs' takings claim are, therefore, presently at issue.

*Factual Background*

Robert and Carol Morris, plaintiffs, own a half-acre lot adjacent to the Eel River in Humboldt County, California, for which they paid $2,500 in 1995. Harvesting timber on one's property for personal use is permitted under county and state law. It is alleged by plaintiffs that the property does not meet the minimum size necessary for any other development under the county's zoning code. Plaintiffs seek to harvest the trees on their property for lumber to build a barn and other facilities on another parcel they own. Plaintiffs assert that such timber production for personal use is the only economically viable use permitted by the state and county.

In 2001, plaintiffs contacted the NMFS with their plan and asked whether it would violate federal law. On March 7, 2001, NMFS staff visited plaintiffs' property to evaluate the potential that the plan to cut six large old-growth redwood trees could violate the ESA by impairing the behavior patterns of certain fish in the Eel River. NMFS informed plaintiffs by letter on May 23, 2001, that the harvest would likely violate the ESA. Plaintiffs allege that the letter contained a statement to the effect that no exception or mitigation could be recommended by the agency. In August 2001, plaintiffs wrote again to the NMFS asking whether there was any lawful way to harvest trees from their property. No response was received. On January 31, 2002, plaintiffs wrote again, and again, no response was received. On March 25, 2002, plaintiffs wrote yet again to ask whether there was a way to lawfully harvest the trees. A response followed on

May 3, 2002, reiterating the agency's view that cutting the trees would violate the ESA. The letter noted, however, that plaintiffs "could apply for an incidental take permit under Section 10 of the [ESA]," [1] which requires the filing of an application and the preparation and implementation of a Habitat Conservation Plan (HCP). In light of this response, plaintiffs replied to NMFS on May 10, 2002, asking it to clarify whether the agency continued to hold the position that no mitigation or exception was possible. No response was received as of October 16, 2002, the date the present action was filed.[2]

The ESA prohibits the "take" of a listed species. 16 U.S.C. § 1539(a)(1)(B) (2000). To "take" a species is a term of art that designates not only directly killing an animal of a species enumerated by the ESA, but also "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). It is alleged that the NMFS' May 23, 2002, letter indicated that the harvesting of the six redwood trees would interfere with the essential behavioral patterns of salmonid species by reducing the "woody debris" that would fall into the river from the trees, thereby reducing the shade available.[3]

An ITP, otherwise known as a "Section 10" permit, authorizes a person to engage in activities that may result in the taking of a listed species provided "such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Plaintiffs have never submitted an application for an ITP.

Plaintiffs investigated filing an HCP and application, and concluded that the permit process would cost more than the value of their trees or their property. The cost estimate plaintiffs used for their analysis is supported by an affidavit of Alice A. Berg, a fisheries biologist with experience in the Northern California area and with the

1. Complaint (Compl.) at ¶ 39.

2. None of the correspondence between the parties is part of the record, except short quotations included in the pleadings. Defendant does not deny the correspondence.

3. Plaintiff's Opposition To Defendant's Motion For Judgment On The Pleadings (Pl.'s Opp'n) at 2.

NMFS.[4] Defendant avers, however, that the estimate is speculative and does not take into account the NMFS' willingness to work with plaintiffs to develop a cost effective application.[5]

### Discussion

Plaintiffs' broadest claim is one heard increasingly from owners of small parcels of property faced with new, complex, and sometimes expensive federal land use regulation. In short, the owners of the land want to cut down their trees for their own use and benefit, namely for lumber to construct a barn. Defendant, through the ESA, may require that those trees remain in place to provide, among other benefits, "woody debris" and shade for certain salmonid species. Put more precisely, plaintiffs allege that defendant "did appropriate, allocate and take the property ... for the purpose of dedicating it to public use, namely the maintenance and preservation of habitat for the Southern Oregon/Northern California Coast coho salmon and the California Coast chinook salmon, and Northern California Steelhead." [6] Since the regulations have foreclosed their otherwise lawful use, allegedly making defendant the effective beneficiary of plaintiffs' property, plaintiffs believe that defendant should be made to pay for the property—or at least that portion of the rights to the property it seeks to control.

A motion for judgment on the pleadings "should be granted only where 'it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim.'" *Owen v. United States,* 851 F.2d 1404, 1407 (Fed.Cir. 1988) (en banc) (quoting *Branning v. United States,* 215 Ct.Cl. 949, 950 (1977)).

■ To say that a claim is ripe for adjudication is to recognize an actual controversy, not one that is merely hypothetical or speculative. "This prudential doctrine serves to prevent premature adjudication and ensure that a case has matured into a controversy proper for judicial resolution. It is inconsistent with our democratic form of government for courts to resolve abstract questions. That is the appropriate sphere for the political branches." *Beekwilder v. United States,* 55 Fed. Cl. 54, 60 (2002). There is no jurisdiction to hear a case that is not ripe, *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 735, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997), and it is plaintiffs' burden to establish ripeness. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

■ It has been held by the United States Supreme Court that a regulatory claim is not ripe "until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 191, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); see also *Suitum,* 520 U.S. at 737, 117 S.Ct. 1659; *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1347 (Fed.Cir.2002), *cert. denied,* 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003).

■ Defendant argues that final agency action with respect to the ESA requires a decision by the NMFS on plaintiffs' application for an ITP. Indeed, the United States Court of Appeals for the Federal Circuit (Federal Circuit) has held in another case involving timber harvesting and an ITP that "denial of a permit is still a necessary trigger for a ripe takings claim. If the government denies the permit, then the aggrieved party can seek compensation." *Boise,* 296 F.3d at 1347. The Federal Circuit was quick to add, however, that "[a]n extraordinary delay in permit processing or bad faith on the part of the agency can give rise to a ripe takings

---

4. Pl.'s Opp'n, Exhibit (Ex.) 1.

5. Defendant's Reply In Support Of Defendant's Motion For Judgment On The Pleadings, Ex. 1, at 4 (Affidavit of Irma Lagamorsino, NMFS field office supervisor, averring that the application "will be less than the cost estimated ... by Alice Berg... [in part because of a willingness of NMFS] to help Plaintiffs, or their representative, develop an HCP and associated ITP application as it pertains to listed salmonid species .... This aid will include detailed guidance and technical assistance throughout the development and application process.").

6. Compl. at ¶ 53.

claim notwithstanding the failure to deny the permit." *Id.* at n. 6.

Plaintiffs acknowledge that the "ripening 'final' agency ... decision ... may not arrive until the landowner has exhausted all available administrative process. But, given its underlying purposes, ripeness hardly requires a landowner to *always* utilize remaining process." [7] The Federal Circuit's note regarding "extraordinary delay" indicates this. Requiring plaintiffs to apply for an ITP, however, does not imply that they need to continue administrative exhaustion beyond a reasonable limit or where it would be futile.

*Boise* establishes the principle, however, that at least an application for the ITP must be made. That decision is binding on "the Court of Federal Claims, which has repeatedly held that ... a regulatory takings claim is premature where the plaintiff has never submitted a permit application to the governing authority." *Beekwilder,* 55 Fed. Cl. at 61. *Beekwilder* involved the requirement of a residential home developer to seek a "Section 404" permit under the Clean Water Act, however, the principle applies equally to the ITP at issue here.

The facts of the present case are distinguishable from *Boise* and other cases which have held similarly, argue plaintiffs, because "the required HCP process will cost more than [plaintiffs'] property is worth ...." [8] Since there are allegedly "no other uses for the property, that process cannot involve any discretion that might modify or lessen the impact of the ESA on the property" and, therefore, "[n]o matter what decision the government ultimately reaches—a permit grant or a permit denial—the required process will have rendered [plaintiffs'] private property devoid of economic value." [9]

Plaintiffs assert that ripeness does not always require a permit application in ESA-related cases.[10] They argue that those cases in which an application for a permit or the exhaustion of administrative process has been a threshold requirement of ripeness were factually distinct from their own. In *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), *Boise,* and *Seiber v. United States,* 53 Fed.Cl. 570 (2002), cases on which defendant relies to make its argument that a permit application is a prerequisite for ripeness, the value of the land was substantially higher than plaintiffs' in the present case and was unquestionably greater than the cost of the permit application process.

Plaintiffs point to the proposition that "plaintiffs need not apply for a permit if plaintiffs can establish that the procedure to acquire a permit is so burdensome as to effectively deprive plaintiffs of their property rights." *Hage v. United States,* 35 Fed.Cl. 147, 164 (1996). It is further argued that the permit here is not merely "burdensome" but, according to the estimate supplied by the Berg affidavit, "will render their property devoid of economic value." [11]

Plaintiffs argue, therefore that, "(1) they can expend more money than the property is worth trying to get the agency to grant a permit that would allow them to engage in a use of their half-acre parcel that, because of the process, is without economic value or (2) they can submit to the NMFS decision preventing the only allowable use of their property, and retain empty title to land that has been pressed into public service and accordingly rendered valueless." [12]

It is true that the precedent relied upon by defendant involves plaintiffs with considerably larger property interests than those in the present action. Nevertheless, and disregarding for the moment whether the inability to harvest timber for personal use would in fact make the land economically worthless, the court notes another alternative.

Plaintiffs could accept the assistance offered by NMFS, which may mitigate the expense, and prepare an application to the

---

7. Pl.'s Opp'n at 5 (citing *Palazzolo v. Rhode Island,* 533 U.S. 606, 622, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)).

8. *Id.* at 6.

9. *Id.* at 7.

10. *Id.* at 10.

11. *Id.* at 12.

12. *Id.* at 14.

best of their ability. Notwithstanding the cost estimate they have received from an expert consultant, it is for the agency and not this court to determine whether the application and HCP plaintiffs may submit to NMFS merits the granting of an ITP. A permit to authorize a limited scope of activities, such as sought by plaintiffs, is unlikely to require a disproportionately complex and costly application and HCP. The fear that an adequate HCP will require the expenditure of an unreasonable sum is yet speculative.

In addition, there is a presumption that government officials act in good faith, *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954), and plaintiffs do not allege that the NMFS has acted otherwise. In fact, showing that a government official or agency acted in bad faith is "intended to be very difficult, and that something stronger than a 'preponderance of evidence' is necessary ...." *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir.2002).

The consideration of ripeness in this case would be entirely different if an application had been submitted, but rejected as insufficient by NMFS. It may be appropriate in those circumstances to determine whether the cost of preparing further applications or HCPs is reasonable, as a means to an end, granted the total value of plaintiffs' parcel. Such a case could conceivably fall within the scope of *Boise, Hage,* or other cases which find takings claims ripe where additional applications would be futile. See *Devon Energy v. United States*, 45 Fed.Cl. 519 (1999); *Formanek v. United States*, 18 Cl.Ct. 785 (1989); *Beure–Co. v. United States*, 16 Cl.Ct. 42 (1988). Plaintiffs have not attempted to comply with the ESA, however, so NMFS cannot be said to have yet rendered a final agency decision. Plaintiffs must, therefore, make an application for an ITP before their claim can be considered ripe. The court does not possess jurisdiction to hear the claim until that threshold step is taken.

### Conclusion

For the above-stated reasons, defendant's Motion For Judgment On The Pleadings is GRANTED. Accordingly, the Clerk is di-rected to DISMISS plaintiffs' complaint without prejudice. No costs.

IT IS SO ORDERED.