CANE TENNESSEE, INC. and
Colten, Inc., Plaintiffs,

v.

The **UNITED STATES,** Defendant.

No. 96–237L.

United States Court of Federal Claims.

Oct. 2, 2002.

Charles F. Lettow, Washington, DC, for plaintiffs.

Kristine S. Tardiff, with whom were Thomas L. Sansonetti, Assistant Attorney General, United States Department of Justice, Washington, DC, for defendant, Daniel W. Kilduff, Office of the Solicitor, United States Department of the Interior, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

This matter comes before the court on Plaintiffs' Motion for Partial Summary Judgment Respecting the Timing and Scope of Temporary and Permanent Takings of Plaintiffs' Coal Estates and Respecting the "Denominator" Applied to the Takings Analysis (Pls.' Mot.) and Defendant's Cross Motion for Partial Summary Judgment (Def.'s Mot.). Plaintiffs, Cane Tennessee, Inc. (Cane) and Colten, Inc. (Colten) own property in Bledsoe County, Tennessee. In their Complaint,[1] plaintiffs assert a right to just compensation for a taking of their mineral interests and other property as a result of the government's regulatory action. Complaint in 00–513 L (2000 Compl.) ¶ 2. Plaintiffs allege that the June 17, 2000 decision of the Secretary of the Interior (Secretary) to designate land encompassing and adjacent to plaintiffs' property as unsuitable for surface mining, and the petition process resulting in the decision, amounted to a taking of their property. *Id.*[2]

## I. Background[3]

Cane and Colten are incorporated in the state of Delaware and owned by the same

---

1. The pending motions arise out of Plaintiffs' Complaint filed on August 25, 2000 docketed as Case No. 00–513 L, which was consolidated into Case No. 96–237 L.

2. In a complaint filed in 1996 and docketed as Case No. 96–237 L, plaintiffs alleged that a taking resulted from the government's refusal to grant mining permits to Cane's lessee, Eastern Minerals International, Inc. (Eastern Minerals) and Colten's lessee, Van Buren Minerals Corporation (Van Buren). Complaint in 96–237 L (1996 Compl.) ¶¶ 1, 5, 9. Defendant moved for summary judgment on plaintiffs' 1996 Complaint. Defendant's Motion for Summary Judgment in Case No. 96–237 L (Def.'s 1996 Mot.) at 1–3. Defendant argued that plaintiffs were barred by laches; that, because plaintiffs themselves never applied for a permit to mine, they could not complain of any governmental action taken against them; and that plaintiffs' claims were contractual in nature and did not involve property interests compensable under the takings clause of the Fifth Amendment. *Id.* The court found that Colten did not have a takings claim because neither Colten nor Van Buren, its lessee, ever submitted an application for a permit to mine. *Cane Tennessee, Inc. v. United States*, 44 Fed.Cl. 785, 790 (1999). The court also found that Cane had a cognizable property interest in the mineral royalties it reserved pursuant to the Eastern Minerals lease and denied summary judgment on defendant's laches defense. *Id.* at 792, 795.

3. The facts contained in this section and in this opinion are only those pertinent to the relevant parcel and temporary taking issues raised in the briefs. Facts cited to the pleadings of only one party do not appear to be in dispute. Additional facts in this matter can be found at *Wyatt v. United States*, 271 F.3d 1090 (Fed.Cir.2001), *rev'g E. Minerals Int'l, Inc. v. United States (Eastern*

person. Plaintiffs' Proposed Findings of Uncontroverted Fact (Pls.' Facts) ¶¶ 3, 11, 12; 2000 Compl. ¶¶ 4, 8. The property at issue in this litigation belonged to the Wyatt family (the Wyatts) and was purchased by Cane and Colten after certain intermediate transactions.[4] 2000 Compl. ¶¶ 1, 4, 8.

Cane purchased in fee simple approximately 10,000 acres for $5.1 million in February of 1979. 2000 Compl. ¶ 4; Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment Respecting the Timing and Scope of Temporary and Permanent Takings of Plaintiffs' Coal Estates and Respecting the "Denominator" Applied to the Takings Analysis (Pls.' Ex.) 10.[5] Under the terms of the purchase agreement, the Wyatts retained a 3.5% royalty interest in any coal to be mined on the Cane property. 2000 Compl. ¶ 5.

Colten purchased 2030 acres in fee simple and 10,000 acres of mineral rights from Milton Bernos for $2.5 million on October 17, 1979. Pls.' Ex. 18, 19; Defendant's Appendix to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of its Cross–Motion for Partial Summary Judgment (Def.'s Ex.) 14 at 184.[6] Under the terms of the purchase agreement, the Wyatts retained a 3.5% royalty interest in any coal to be mined on the Colten property. 2000 Compl. ¶ 10.

In February 1979, Cane granted an exclusive leasehold in its mineral interests to Eastern Minerals, a corporation wholly owned by Milton Bernos. Pls.' Facts ¶ 8. The lease provided for an initial term of twelve years and granted Eastern Minerals the unilateral right to extend the lease for up to four additional ten-year periods. Id.

In October 1979, Colten granted an exclusive leasehold in its mineral interests for a similar term to Van Buren, also owned by

---

Minerals), 36 Fed.Cl. 541 (1996), as well as in this court's earlier opinion and order, reported at 44 Fed.Cl. 785 (1999). The *Eastern Minerals* litigation was brought by Eastern Minerals and Van Buren, the lessees of the plaintiffs in this case. *See Eastern Minerals*, 36 Fed.Cl. at 545. Initially, Cane and Colten did not attempt to join the *Eastern Minerals* litigation, but rather filed their own action in this court on April 30, 1996 giving rise to Case No. 96–237 L. *See Cane Tennessee, Inc.*, 44 Fed.Cl. at 788. After the trial court in *Eastern Minerals* found the United States liable for a taking to Eastern Minerals and to the Wyatts, who held royalty interests in the property leased to Eastern Minerals and Van Buren, Cane and Colten moved to consolidate the two cases. *Id.* That motion was denied on November 20, 1996, *see id.*, and the *Eastern Minerals* case and this case have been litigated on separate tracks. Case No. 96–237 L was transferred to this court on January 27, 1999.

4. Milton Bernos (Bernos) had originally acquired 10,000 acres of mineral rights and 2030 acres in fee simple from the Wyatts. Defendant's Appendix to Plaintiff's Motion for Partial Summary Judgment and in Support of its Cross–Motion for Partial Summary Judgment (Def.'s Ex.) 13, 14. Colten purchased this property from Bernos in October of 1979. 2000 Compl. ¶ 8. Cane purchased its property directly from the Wyatts, with Bernos acting as a broker for that transaction. *See* Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment Respecting the Timing and Scope of Temporary and Permanent Takings of Plaintiffs' Coal Estates and Respecting the "Denominator" Applied to the Takings Analysis (Pls.' Ex.) 10;

Plaintiff's Memorandum in Support of Their Motion for Partial Summary Judgment Respecting the Timing and Scope of Temporary and Permanent Takings of Plaintiff's Coal Estates and Respecting the "Denominator" Applied to the Takings Analysis (Pls.' Mem.) at 3–4.

5. The brief supporting plaintiffs' motion stated that "Cane did not purchase a fee simple interest in the property." Pls.' Mem. at 7. Defendant's Cross–Motion stated that Cane did in fact purchase its property in fee simple. Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of its Cross–Motion for Partial Summary Judgment (Def.'s Mem.) at 5. In their Opposition to Defendant's Cross–Motion for Partial Summary Judgment and Reply in Support of Plaintiffs' Motion for Partial Summary Judgment (Pls.' Opp.), plaintiffs appear to concede that Cane holds or has held the property involved in this litigation in fee simple. Pls.' Opp. at 31 ("Cane and Colten each have or had an 'estate in fee simple,' ... in the mineral estates *and* in the surface estates.") (citations omitted and emphasis in original); *accord* Pls.' Ex. 10 (the Cane Deed) at 225; Pls.' Ex. 18 (the Colten Deed) at 401.

6. The exact acreage is in question. The Complaint states that Colten bought 1,813.45 acres in fee simple, *see* 2000 Compl. ¶ 8, but the deeds offered as Plaintiffs' Exhibits 18 and 19, as well as a Summary of Land and Mineral Rights Owned by Cane and Colten Companies offered as Defendant's Exhibit 14 state the acreage as 2030 acres. It is unnecessary to determine the exact acreage in connection with the pending motions.

Milton Bernos. Pls.' Facts ¶ 13. By the terms of both leases, the tenants (Eastern Minerals and Van Buren) were required to pay as rent the greater of a fixed minimum rent or 3.5% of revenues from an anticipated coal mining project. 2000 Compl. ¶ 10. The leases called for mining operations to begin promptly and for the tenants to mine all the merchantable coal on the respective properties. *Id.;* Pls.' Ex. 12 at 234–36 (as to Cane); Pls.' Ex. 20 at 438–40 (as to Colten).

In 1977 Congress enacted the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 (1986) (SMCRA), which required permits as a precondition to mining. *See* 2000 Compl. ¶¶ 17, 18. *See also Eastern Minerals,* 36 Fed.Cl. at 544. In 1980 and 1981, Eastern Minerals obtained two separate one-year permits from the State of Tennessee that authorized Eastern Minerals to prepare approximately 33 acres on the Sewanee coal seam on the Cane property for a box cut for future coal mining operations. *See Wyatt v. United States,* 271 F.3d 1090, 1093–94 (Fed.Cir.2001). Eastern Minerals then expended $3.8 million to develop the box cut and prepare for mining operations on the Sewanee seam. *See* Pls.' Facts ¶ 14. *See also Wyatt,* 271 F.3d at 1093–94.

Eastern Minerals' subsequent application to renew its mining permit was denied in 1984. *Wyatt,* 271 F.3d at 1093–94. Eastern Minerals continued unsuccessfully to pursue a permit until 1994. *Id.* at 1094–95. The United States Department of Interior, Office of Surface Mining (OSM), continuously considered Eastern Mineral's application until it rendered a final decision on the merits of Eastern Minerals' permit application in 1994. *Id.*

In 1995, OSM accepted and undertook consideration of a petition to designate land encompassing and adjacent to plaintiffs' property as unsuitable for surface coal mining operations. 2000 Compl. ¶ 30. On June 17, 2000, the Secretary issued a Letter of Decision designating most of the petition area as unsuitable for surface coal mining (the Unsuitability Decision). *Id.* ¶ 37. Plain-

tiffs then filed their second takings action in this court. *See* 2000 Compl.

Plaintiffs' current motion asks this court to find defendant liable for a categorical temporary taking of plaintiffs' property for the period of time prior to and during which the Department of the Interior was considering the petition. Pls.' Mot. at 1–5; Pls.' Ex. 1; Pls.' Opp. at 12. Plaintiffs also ask that this court rule that plaintiffs suffered a permanent taking of their property in June of 2000, when the Secretary issued his Unsuitability Decision. Pls.' Mot. at 2.

Plaintiffs' motion asserts that under the Federal Circuit's decision in *Whitney Benefits, Inc. v. United States,* 926 F.2d 1169 (Fed.Cir.1991), plaintiffs' mineral estate, and not their property as a whole, is the "relevant parcel" or "denominator" that the court should use to determine whether plaintiffs have suffered a compensable taking. *Id.* at 4. Defendant has also cross-moved for summary judgment on plaintiffs' temporary takings claim and on the "denominator" question. Def.'s Mot. at 2. Defendant opposes plaintiffs' motion for partial summary judgment on their permanent takings claim, *id.,* but has not sought summary judgment on this claim.

The court has been asked to decide three issues: 1) the relevant parcels that constitute the property interests of Cane and Colten subject to the taking alleged in this case (the "denominator" issue); 2) whether there was a temporary taking prior to the Secretary's Unsuitability Decision on June 17, 2000; and 3) the date the alleged temporary taking occurred. *See* Plaintiffs' Opposition to Defendant's Cross–Motion for Partial Summary Judgment and Reply in Support of Plaintiffs' Motion for Partial Summary Judgment (Pls.' Opp.) at 1; Defendant's Reply Brief in Support of its Cross–Motion for Partial Summary Judgment (Def.'s Reply) at 1.[7]

The primary focus of the parties' briefing and this opinion is on the "denominator" issue. This opinion also briefly addresses but reserves resolution of plaintiffs' tempo-

---

7. The court relies on the parties' reply briefs in defining the issues in dispute because both sides availed themselves of the opportunity during

briefing more clearly to identify and address the opposing party's arguments.

rary takings claim, including determination of the date of occurrence of any temporary taking, until after either additional dispositive briefing or trial on the merits.

## II.  Discussion

### A.  Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Rules of the Court of Federal Claims (RCFC) 56(c). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under governing law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to proffer such evidence. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985), to whom the benefits of all favorable inferences and presumptions run. *See H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The fact that this is "a takings case does not affect the availability of summary judgment when appropriate to the circumstances." *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996).

### B.  The Takings Clause

The Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. A constitutional taking can be found in the absence of a physical invasion when a government act denies the owner all "economically viable use of his land." *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). There is no bright line test to determine whether a government action results in a taking. *See Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 399 (1989), *aff'd,* 926 F.2d 1169 (Fed.Cir.1991). When the nature of the government action does not constitute a physical taking of property but, rather, limits the use a property owner may make of his property, the basic analytical tool for assessing whether a taking has occurred is the three-part test developed by the Supreme Court in *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *See Eastern Enters. v. Apfel,* 524 U.S. 498, 522–23, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Avenal,* 100 F.3d at 937–38.

The *Penn Central* test considers the character of the governmental action, the economic impact on the claimant, and the extent to which the governmental action has interfered with distinct investment-backed expectations. *See Penn Central,* 438 U.S. at 124–25, 98 S.Ct. 2646; *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224–25, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Avenal,* 100 F.3d at 937. However, before a court may apply *Penn Central's* three-part test, the court must determine whether a plaintiff's interest is a compensable property interest within the meaning of the Fifth Amendment. *See M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.1995); *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir.1993); *Avenal v. United States,* 33 Fed.Cl. 778, 784–85 (1995), *aff'd,* 100 F.3d 933 (Fed.Cir.1997). It is essential to determine the scope and nature of a plaintiff's property interest to decide whether there has been a taking.

## C. The Relevant Parcel

█ In order to determine the relevant parcel that should be considered in the takings analysis in this case, the court must determine whether to apply the Supreme Court's general rule for ascertaining the "relevant parcel" in regulatory takings cases, "the parcel as a whole" rule, or whether, as plaintiffs argue, *see* Pls.' Mot. at 4, to follow the Federal Circuit's decision in *Whitney Benefits,* an alternative approach. *Compare Penn Central,* 438 U.S. at 130–31, 98 S.Ct. 2646 (holding that a court must consider the parcel as a whole and not a segment of the parcel when measuring the effect a regulation has on property rights under the Fifth Amendment); *accord Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 1481, 152 L.Ed.2d 517 (2002), *with Whitney Benefits, Inc. v. United States,* 926 F.2d 1169, 1176 (Fed.Cir.1991) (finding that SMCRA's prohibition on surface mining deprived an owner of all economically viable use of its coal property).

The court will begin its analysis by reviewing the development of the "parcel as a whole" rule. The court will then analyze the differences and similarities between *Whitney Benefits* and this case and address the parties' arguments with respect to the applicability or inapplicability of *Whitney Benefits* to this case.

## D. The Parcel as a Whole Rule

Since 1979, *Penn Central* has served as the analytical touchstone in regulatory takings cases. *See, e.g., Tahoe–Sierra,* 122 S.Ct. at 1481 n. 23 ("Our polestar instead remains the principles set forth in *Penn Central.* . . . ") (quoting *Palazzolo v. Rhode Island,* 533 U.S. 606, 633, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (O'Connor, J., concurring)). In *Penn Central,* the Supreme Court declined to adopt a per se rule for determining whether a regulation goes "too far" and invades a property owner's rights under the Fifth Amendment. *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. Instead, *Penn Central* called for an ad hoc factual consideration of "a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action" for determining whether a regulation goes "too far." *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448 (citing *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646). In order to analyze the regulation's economic effect on the landowner and on the landowner's investment-backed expectations for the property, the court must determine the nature of the owner's property interest at issue.

*Penn Central* unambiguously requires that in regulatory takings cases the default rule is that the tribunal must focus on "the parcel as a whole":

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole. . . .

*Penn Central,* 438 U.S. at 130–131, 98 S.Ct. 2646.

In addition to confirming that the "parcel as a whole" rule remains the default analytical framework in regulatory takings cases, *Tahoe–Sierra* also confirmed that the categorical exception to the "parcel as a whole rule" adopted in *Lucas, see* 505 U.S. at 1017, 112 S.Ct. 2886, is reserved for " 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.' " *Tahoe–Sierra,* 122 S.Ct. at 1483 (quoting *Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886) (emphasis in original); *see also Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886 (holding that a [categorical] taking occurs when a regulation deprives the landowner of "all economically beneficial uses" of its land). The Supreme Court in *Tahoe–Sierra* further clarified that "[a]nything less than a 'complete elimination of value,' or a 'total loss,' . . . would require the kind of analysis applied in *Penn Central* [application of the parcel as a whole rule, as opposed to the Lucas categorical rule]." *Tahoe–Sierra,* 122

S.Ct. at 1483 (quoting *Lucas*, 505 U.S. at 1019–20 n. 8, 112 S.Ct. 2886).

### E. *Whitney Benefits:* the "Total Destruction of Economically Viable Use"

Plaintiffs challenge the application of the "parcel as a whole rule" in this case, relying on the Federal Circuit's 1991 decision in *Whitney Benefits*. According to plaintiffs, *Whitney Benefits* is "binding precedent for this court's decision respecting the denominator." Pls.' Opp. at 17.

The plaintiffs in *Whitney Benefits* successfully challenged SMCRA's prohibition on the mining of alluvial valley floors "west of the one hundredth meridian west longitude", 30 U.S.C. § 1260(b)(5)(A),[8] on the grounds that the regulation took plaintiff's mineral estate without the payment of just compensation. *See Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 396–98 (1989). Upholding the decision of the trial court after trial, the Federal Circuit held that the application of SMCRA to the *Whitney Benefits* plaintiff resulted in a "total destruction of all economically viable use" of that plaintiff's property. *Whitney Benefits*, 926 F.2d at 1177.

It is on the issue of "total destruction of all economically viable use" that the facts of *Whitney Benefits* appear to diverge from the facts of this case. In *Whitney Benefits*, "the *only* property ... involved [was] the right to surface mine a particular deposit of coal." *Id.* at 1172 (emphasis in original). The plaintiffs in *Whitney Benefits* purchased "ownership in fee of coal underlying 1,327 surface acres." *See Whitney Benefits*, 18 Cl.Ct. at 396. The plaintiffs then leased their coal mining rights to another party, PKS, which purchased 590 acres of surface property overlying a portion of Whitney's coal deposit for the sole purpose of providing access to the coal. *Id.* at 397, 405. The PKS lease remained in effect when the action was brought to this court. *Id.* at 397. In 1976 PKS filed a permit application with the Wyoming Department of Environmental Quality to conduct surface mining on the property, but that permit application was withdrawn for procedural reasons. *Id.* Shortly thereafter, and before PKS could refile its permit application, SMCRA was passed *Id.*

The entirety of the coal estate at issue in *Whitney Benefits* was to be mined using surface methods. 18 Cl.Ct. at 397. SMCRA "clearly prohibited surface mining of [Whitney's] coal" and since the coal could only be mined by surface methods, SMCRA destroyed all economically viable use of that plaintiff's property.[9] *Id.* at 405; 926 F.2d at 1172. The Federal Circuit found that the purchase of the surface of the estate in *Whitney Benefits* was done only as part of the investment backing of the planned coal mining operations, and that any other use of the property, such as farming, would be speculative based on the record. 926 F.2d at 1174.

### F. The Economically Viable Uses of Plaintiffs' Property

Unlike the *Whitney Benefits* case, the record in this case does not support a finding that all economically viable uses of plaintiffs' property were eliminated by the Secretary's Unsuitability Decision.

#### 1. Cane's Property

In 1979, Cane purchased approximately 10,000 acres of property in fee simple from the Wyatts for approximately $5.1 million. 2000 Compl. ¶ 4. Cane alleges that it purchased the property solely to mine the property's embedded coal. *Id.*

Plaintiffs rely for their characterization of the value of the Cane property on an investment brochure prepared by Citibank (Citibank brochure) to market the Cane property, which described it as a "10,000–Acre Coal Property." Pls.' Ex. 7. The brochure describes the property as a real estate invest-

---

8. In this case the Secretary made his unsuitability determination pursuant to Section 522 of SMCRA, 30 U.S.C. § 1272, whereas in *Whitney Benefits*, the unsuitability determination was made under another section of SMCRA, 30 U.S.C. § 1260(b)(5)(A). *See* Pls.' Opp. at 17. Plaintiffs suggest that this distinction is not material, Pls.' Opp. at 17, and defendant does not appear to contest the point. *See* Def.'s Mot. at 33.

9. In this case plaintiffs intended to mine a portion of their coal, specifically the Sewanee seam, by underground methods. 2000 Compl. ¶ 16.

ment in land that was to be used for coal mining. *See* Pls.' Ex. 7 at 130 ("The property is believed to possess a vast quantity of excellent-quality coal reserves."). The brochure also represented, however, that the property possessed value external to mineral development. *See id.* ("The property possesses inherent real estate value as a scenic parcel of recreation-oriented land."). While the general tenor of the investment proposal is that of a proposal to purchase land on which coal was to be mined, the document clearly also advertises the values of the property other than for coal production:

> The property is scenic with gently rolling surface, wooded areas, several farms, and cleared areas for cattle grazing. A stream cane [sic] Creek, along with its various tributaries, meanders across the 8,000–acre tract before flowing into Falls Creek Falls State Park. The creek is located approximately 100 feet below the general surface of the land.
>
> Acquisition of the property includes the rights to mine coal from the property and cut timber.

Pls.' Ex. 7 at 132.

Not only does the brochure describe value attributable to development opportunities other than coal production, the brochure also lists as a risk of the investment that coal reserves on the property will not be mineable. *See* Pls.' Ex. 7 at 143. The brochure unequivocally cautioned investors that coal mining on the property may not be feasible:

> Despite the opinions rendered by competent third party engineers, geologists, and other consultants, there can be no assurance that the coal reserves on the subject property are mineable. Required permits may not be attainable, or the seam width may fluctuate so radically that mining the coal may be uneconomical or physically impossible. Any of the above could render the mineral rights virtually valueless, leaving the value of the surface land as the Investor's only source of recapturing his investment.

*Id.*

Defendant points out that plaintiffs' own real estate appraiser, Greer Investment Company (Greer), concluded that as of Janu-

ary 30, 1979, the unencumbered fee simple interest Cane was about to purchase had a quick-sale value of $4,802,000, based on comparable sales data. Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Facts) ¶ 27; Pls.' Ex. 8 at 147. Defendant also points out that the Greer appraisal specifically acknowledged the unpredictability associated with mineral development on the property:

> [S]ubject property "most likely has varying amounts of coal deposits such as are present throughout the plateau area, so one of its alternative uses could be strip-mining. However, such activity has been curtailed somewhat by recently enacted regulations governing reclamation of the land. In the absence of specific tests concerning subject's coal deposits, the feasibility of such operations is unknown."

*See* Def.'s Mot. at 9 n. 10; *see also* Pls.' Ex. 8 at 172 ("Upon inspection of the subject property and surrounding lands, it is apparent that coal deposits are prevalent throughout this area ... however, no determination is attempted in this report as to quantity, quality, or accessibility of coal deposits.").

Plaintiffs disagree with defendant's argument that the Greer Report did not consider the property's coal deposits in determining its quick-sale value. *See* Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts (Pls.' Resp. to Def.'s Facts) at 17. According to plaintiffs, the comparative sales data "included tracts where either the surface estate or the surface and mineral estate were being sold to facilitate mining." Pls.' Resp. to Def.'s Facts at 17–18 (citing Supplemental Exhibits to Plaintiffs' Opposition to Defendant's Cross–Motion for Partial Summary Judgment and Reply in Support of Plaintiff's Motion for Partial Summary Judgment (Pls.' Supp.Ex.) 44, Declaration of Ronald H. Swafford). Ronald Swafford's declaration states that ("the first four (4) of the six (6) sales used were purchased for their mineral (coal) interests by companies or individuals who were in the coal business"). Pls.' Supp.Ex. 44 ¶ 10.

Both parties have retained timber experts to estimate the value of the timber contained

on the Cane property. Defendant's expert, Wayne E. Williams, estimated that the timber on the Cane property had a value of approximately $4,247,048 as of June of 2000. Defendant's Appendix to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of its Cross–Motion for Partial Summary Judgment (Def.'s Ex.) 36 at 287. Plaintiffs' expert, Michael Black, estimated that as of the same date, Cane's timber was worth $3,944,313. Pls.' Ex. 43 at 995–96. Plaintiffs' expert also stated that as of July of 2001, the total value of Cane's timber had declined to $3,076,088, reflecting the spread of a bark beetle infestation. *Id.* at 996 [10] Under either timber valuation, however, it is clear that the Cane property contains timber reserves with significant value.

In light of the foregoing evidence, it is clear to the court that plaintiffs cannot with respect to the Cane property, meet the test of *Whitney Benefits* that the application of SMCRA destroyed "all economically viable use" of the property. 926 F.2d at 1172. Therefore the court will utilize the *Penn Central* test to analyze whether there has been a taking of the Cane property in future proceedings.

### 2. Colten's Property

■ Unlike the Cane acquisition, Colten acquired its property through a two step process. Colten's property was first purchased by Bernos from the Wyatts. *See* Def.'s Ex. 13 (Deed transferred from the Wyatts to Bernos).[11] Colten then purchased both fee simple and mineral estates from Bernos on October 20, 1979, for a total sales price of $2,500,000. 2000 Compl. ¶ 8.

As with the Cane acquisition, Citibank prepared an "investment proposal synopsis," which recommended that an investor purchase the Colten parcels for $2,750,000. Pls.'

Ex. 15 at 313. As with the Cane transaction, the investment proposal called for a lease to another entity to pursue coal mining operations on the property. *Id.* at 313–14. Colten leased the property to Van Buren Minerals Corporation, which was created and wholly owned by Bernos. Pls.' Ex. 20 at 432, 437, 480. The lease gave Van Buren rights to "all standing timber located on the Land and all coal or other minerals included in Landlord's Estates." *Id.* at 437–38. But Colten reserved "the entire ownership and control of the Land including, but not limited to, the right to use, lease and sell from time to time the Land or any portion of the Land for any purpose," so long as Colten's use did not interfere with Van Buren's rights under the lease. Pls.' Ex. 20 at 440, 449–50.

The Citibank brochure for the Colten transaction was more focused on coal production than the brochure prepared for the Cane transaction. As appears in an excerpt from the brochure quoted below, the Colten property was initially marketed to Cane. The investor decided to create Colten as a separate corporate entity to enter into the transaction. Pls.' Facts at 11. The brochure discusses mining operations already taking place on the property, stating that these activities were "yielding production levels that support present reserve estimates." Pls.' Ex. 15 at 315. Further, in marketing this property to Cane, Citibank states that:

> The purchase of these tracts by Cane would represent a consolidation of one of the largest contiguous holdings of coal reserves in the state of Tennessee. This consolidation affords certain economies in mining and cleaning operations as well as enhancing the negotiating posture of Eastern to obtain higher prices for the coal due to size of reserves and their ability to deliver large quantities of coal.

**10.** The figures quoted from plaintiffs' and defendant's timber experts are based on many assumptions, which are not pertinent to the court's decision.

**11.** Bernos had acquired 10,000 acres of mineral rights from the Wyatts on February 16, 1979, for $62,500. Def.'s Ex. 13 at 153, 159 (Deed from the Wyatts to Bernos). In addition, Bernos had purchased approximately 100 acres in fee simple

from the Wyatts in 1979 for $11,000, plus fee simple title to an additional 1,930 acres for $674,546. Def.'s Ex. 14 at 3 (Summary of Land and Mineral Rights Owned by Cane and Colten Companies [an appraisal prepared for Citibank] ). *But see supra* note 6 regarding the uncertainty about the exact acreage of Colten's property.

*Id.* at 315–16. But even with this focus on coal mining, the Citibank brochure also advertised that "[t]he property to be purchased in fee simple ownership possesses inherent real estate value as a scenic parcel of recreation-oriented land." Pls.' Ex. 15 at 315. This portion of the brochure does not refer to the 10,000 acres of mineral estate that Colten also purchased. *See id.*

The Citibank brochure was supported by an economic assessment prepared by Behre Dolbear & Company, Inc. (Behre Dolbear), a mining consultancy firm. Pls.' Ex. 16. The Behre Dolbear report, however, limited its analysis to potential revenue to be derived from the Colten property's coal reserves and did not directly consider the property's value external to coal development. Pls.' Ex. 16 at 324, 337. Behre Dolbear estimated that the investment in total would yield approximately $5 million dollars based on an initial investment of $2.5 million over a 13–year period, with an internal rate of return of 11.2%. *Id.* at 386. The Behre Dolbear estimate was conditioned, *inter alia*, on the assumption that financing for the Cane–Eastern Minerals coal mining venture would be obtained and that the infrastructure (roads, power, water) and the facilities provided to the Cane–Eastern Minerals project would be utilized at no capital cost to the Colten–Van Buren mining project. *Id.* at 332.[12] Of course, the Eastern Minerals mining operation infrastructure was never completed. *See Wyatt v. United States,* 271 F.3d 1090, 1093–95 (Fed.Cir.2001).

The record shows that in the years since the Eastern Minerals and Van Buren leases expired in 1991, no permits to mine coal have been filed for either the Cane or Colten properties. Pls.' Ex. 39 (Dep. of Louis Arovas, pp. 9–11). Since the termination of the leases, Cane has sold a number of parcels in fee simple. In 1993, Cane sold 568 acres of land that was considered valuable for its timber. Def.'s Ex. 26 (Pls.' Resp. to Interrog. No. 24). Then, in December 1995,

Cane and Colten entered into a joint venture with Ronald and Judy Swafford (joint venture) to develop, subdivide, and sell portions of Cane's and Colten's property. Def.'s Mem. at 16. From June 1996 until February 2002, the joint venture sold approximately 1,670 acres, taken from both the Colten and Cane parcels.[13] Def.'s Mem at 17; Def.'s Ex. 40 at 354 (A Summary of Cane/Colten–Swafford Joint Venture Acquisition and Sales).

While the court has concluded that the Cane property retained economic value sufficient to require analysis of an alleged taking under the *Penn Central* test, the evidence is not as fully developed regarding the Colten property. The sale of some of the Colten property to developers indicates that this portion of the property retains economic value, but the parties have not developed evidence regarding the continuing value of the 10,000 acres of mineral rights that Colten owns as well. Further, there has been no evidence presented concerning the value of timber on the Colten property (other than a single parcel sale possibly related to timber value), Def.'s Ex. 26, or any other economically viable uses that may exist. The court, therefore, leaves open for determination in future proceedings whether the level of deprivation in this case with regard to the Colten property could be viewed as the same or very similar to the property deprivation in *Whitney Benefits.*

Case law in this area indicates that application of the ad hoc analysis required by *Penn Central* for determining whether a regulation has gone "too far" and effected a taking can require full factual development including a trial. *See, e.g., Naegele Outdoor Advertising, Inc., v. City of Durham,* 844 F.2d 172, 175–76 (4th Cir.1988) (explaining that Supreme Court precedent "raise[s] questions about the propriety of summary judgment of takings claims without a fully developed factual record."); *Brace v. United States,* 48 Fed.Cl. 272, 284 (2000) ("The second factor of the *Penn Central* test [econom-

---

**12.** While the Colten–Van Buren property would be able to utilize the infrastructure at no capital cost, it would be responsible for the cost of a production capacity increase in the facilities (preparation plant, barge or tipple loading structures) originally provided and financed by the

Cane–Eastern Minerals project. Pls.' Ex. 16 at 332.

**13.** This property was sold for a total sales price of $1,744,916. Def.'s Mem. at 17; Def.'s Ex. 40.

ic impact] requires a development of factual record at trial or additional discovery."). In order for this court to grant summary judgment pursuant to the next round of briefing on the *Penn Central* test, the factual record will need to be fully developed with regard to the economic impact of the Secretary's Unsuitability Decision on plaintiffs' investment-backed expectations for both the Cane and Colten properties.

### G. Plaintiffs' Temporary Takings Claim

Plaintiffs also ask this court to enter summary judgment "that actions [taken] by the Department of the Interior and Secretary of the Interior on an unsuitability petition ... took Cane's and Colten's right to mine their embedded coal, first on a temporary basis (October 5, 1995) and then permanently (June 17, 2000).... " Pls.' Mot. at 5. October 5, 1995 is when OSM accepted and began considering an unsuitability petition, which ultimately resulted in the Secretary's decision that plaintiffs' property was unsuitable for surface mining. Pls.' Mem. at 11; 2000 Compl. at Ex. 1. According to plaintiffs, "The timing and scope of the government's unsuitability actions and designations establish ... the scope and timing of the takings" in this case. Pls.' Mem. at 20. Plaintiffs argue this court should find that "[t]he temporary takings period ... commenced no later than October 5, 1995" because the unsuitability process resulted in a moratorium on their intended mining operations. *Id.* at 21. In subsequent pleadings, plaintiffs offer May 28, 1993, as an alternative date when the temporary taking could have occurred. Pls.' Opp. at 12. On the date of May 28, 1993, Eastern Minerals and Cane gave up their efforts to obtain mining permits from the government. *Id.*

Plaintiffs further argue that the temporary takings period ended on June 17, 2000, when the Secretary issued his Letter of Decision with respect to the unsuitability petition. Pls.Mem. at 22. As part of their argument, plaintiffs assert that the temporary takings claim immediately preceded the permanent

taking, and therefore is used for valuation purposes only. Pls.' Opp. at 11–12. According to plaintiffs, "[A]n interest component should be applied to both of these elements to arrive at an overall amount of just compensation." *Id.* at 12, n. 13 (citing *Seaboard Air Line v. United States,* 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664 (1923)). This is because the four-year, eight-month, twelve-day mining moratorium that plaintiffs allege constituted the temporary taking "was just one link in a sixteen-year chain of events by which mining Cane's coal estates has been forestalled and Cane's mining rights have been seized." *Id.* at 10–11.

In response to plaintiffs' motion for summary judgment regarding the temporary taking, defendant argues that both dates offered by the plaintiffs fail. Def.'s Reply at 4–5. Defendant argues that the May 1993 date fails because it precedes the start of the regulatory process. *Id.* at 14. As of this date the government had not and could not as a matter of law[14] have made a final decision. *Id.* at 5. Defendant argues that the October, 1995 date also fails because this represents the very beginning of the regulatory decision making process. *Id.* The government cites to *Tabb Lakes, Ltd. v. United States* for guidance on when a temporary taking could commence:

[The Supreme Court's decisions in] *Danforth [v. United States,* 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939)] and *Agins* hold that the government is not responsible for diminution in value caused by preliminary activity.... While Danforth and *Agins* leave open the possibility that a taking may occur by reason of "extraordinary delay" in governmental decision making, nothing in case law suggests that unreasonable delay converts the first preliminary act into the date of the taking. To the contrary, *First Lutheran [First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 320, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)] interprets Danforth (and

---

14. "[T]he Federal Circuit specifically found that Eastern Minerals (Cane's lessee) relinquished its leasehold interest in February of 1991 and that OSM could not, as a matter of law, have issued a

permit to Eastern Minerals after that date." Def.'s Reply at 5 (citing *Wyatt,* 271 F.3d at 1096–97).

*Agins*) to stand for the proposition "that the valuation of property must be calculated as of the time of the taking." ... Thus, only after the delay becomes unreasonable would a taking begin....

*Tabb Lakes,* 10 F.3d 796, 803 (Fed.Cir.1993); *see* Def.'s Reply at 5–6.

Defendant also argues that plaintiffs' temporary takings claim fails because plaintiffs have failed to plead "extraordinary delay" in the petition process. Def.'s Mem. at 47 (citing *Dufau v. United States,* 22 Cl.Ct. 156 (1990)). Defendant quotes the Federal Circuit's discussion of delay in *Wyatt* to support its argument that plaintiffs are not entitled to a temporary taking remedy here.

The length of the delay is not necessarily the primary factor to be considered when determining whether there is extraordinary government delay. Because delay is inherent in complex regulatory permitting schemes, we must examine the nature of the permitting process as well as the reasons for any delay. Moreover, it is a rare circumstance that we will find a taking based on extraordinary delay without a showing of bad faith.

*Wyatt,* 271 F.3d at 1098; *see* Def.'s Mem. at 48.

The ad hoc factual inquiry involved in the *Penn Central* test forms the basis for plaintiffs' argument that extraordinary delay is not required to prove a temporary taking occurred in this case. As plaintiffs point out, the Court in *Tahoe–Sierra* explicitly noted that "the *Penn Central* framework adequately directs the inquiry to the proper considerations—only one of which is the length of delay." Pls.Opp. at 16 (citing *Tahoe–Sierra,* 122 S.Ct. at 1487 n. 34). Plaintiffs contend that, even if a showing of extraordinary delay is necessary, they met this burden in their opposition brief. Pls.' Opp. at 9, n. 9; Transcript of Oral Argument on Partial Motions

for Summary Judgment, July 24, 2002(Tr.) at 92–93.

The Federal Circuit, however, recently addressed this issue and decided that extraordinary delay is an essential element of regulatory takings cases. *Boise Cascade Corp. v. United States,* 296 F.3d 1339 (Fed.Cir.2002); *accord Seiber v. United States,* 53 Fed.Cl. 570 (2002). The Federal Circuit was explicit in *Boise,* stating:

[W]hether a taking occurred should be analyzed under *Penn Central.* This does not affect the longstanding rule that, absent denial of a permit, only extraordinary delays in the permitting process ripen into a compensable taking. Whether a particular extraordinary delay constitutes a taking is governed by *Penn Central,* just as are temporary moratoria.

296 F.3d at 1352.

Plaintiffs attempted to distinguish *Boise* at oral argument by arguing that this case falls outside the *Boise* framework, and falls instead under an exception identified by the Court in *Tahoe–Sierra.* Tr. at 91–92. Plaintiffs argue that this case falls within "hypothetical six" in *Tahoe–Sierra,* because the unsuitability petition process begun on October 5, 1995 was only one of a series of temporary moratoria that have been in effect for most of the period of plaintiffs' ownership.[15] *Id.*

While *Boise* mandates that extraordinary delay is required to ripen a temporary taking claim in most regulatory cases, it is unclear whether that rule applies to this case. Absent fully developed briefing and proposed findings of fact,[16] the court leaves open for future determination whether this case falls outside the general rule of *Boise,* and if extraordinary delay is required, whether plaintiffs have a sufficient factual basis for overcoming summary judgment.

15. "Hypothetical six" in *Tahoe–Sierra* is part of a wider discussion where the Court articulates seven possible circumstances in which government actions might constitute a taking. *See Tahoe–Sierra,* 122 S.Ct. at 1484–85. Specifically, the Court notes that "with the benefit of hindsight, we might characterize the successive actions of [defendant] as a 'series of rolling moratoria' that were the functional equivalent of a permanent taking." *Id.* at 1485. The Court did not address this issue in its decision because the order granting review did not encompass the issue. *Id.*

16. *Boise* was decided after the parties had concluded their briefings on this subject, but before oral argument. The parties declined the opportunity for post-hearing briefing to discuss the impact of this case. Tr. at 4–5.

With respect to plaintiffs' request for summary judgment on its temporary takings claim, the Supreme Court confirmed in *Tahoe–Sierra* that the ad hoc factual inquiry of *Penn Central* remains the "default rule" in regulatory takings cases, especially those regulatory takings claims which are based on temporary moratoria. *See Tahoe–Sierra,* 122 S.Ct. at 1484, 1486; *accord Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1350 (Fed.Cir.2002) (interpreting *Tahoe–Sierra* to require that temporary takings claims be analyzed under *Penn Central*). The Court in *Tahoe–Sierra* noted that, while the length of a temporary moratorium is an important consideration in determining whether there has been a taking, there is no per se rule that takes the place of the *Penn Central* test. *See Tahoe–Sierra,* 122 S.Ct. at 1485. Given the clear Supreme Court precedent on this matter, it appears to the court appropriate to defer decision on whether the defendant's unsuitability petition process effected a temporary taking of plaintiffs' property until the record is more fully developed under the requirements of the *Penn Central* test.[17]

 That noted, it is clear to the court that a taking could not have occurred prior to October 5, 1995, when the government action concerning the unsuitability petition began. The Federal Circuit has already ruled that there was no compensable taking of Cane's property prior to February 28, 1991. *Wyatt,* 271 F.3d at 1097. That decision addressed the process by which Eastern Minerals, Cane's lessee, attempted to obtain a mining permit for that property. *Id.* Because the government action that preceded the decision of Cane and Eastern Minerals on May 28, 1993 to give up efforts to obtain a mining permit did not constitute a taking, the court cannot find that the decision itself, unconnected to government action, began a separate temporary taking.

III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment Respect-

ing the Timing and Scope of Temporary and Permanent Takings of Plaintiffs' Coal Estates and Respecting the "Denominator" Applied to the Takings Analysis is DENIED. Defendant's Cross Motion for Summary Judgment is GRANTED with respect to the denominator issue as to the Cane property and with respect to plaintiffs' claim that a temporary taking could have occurred prior to October 5, 1995, and is otherwise DENIED.

On or before Wednesday, October 23, 2002, the parties shall file with the court their joint status report, or, if they cannot agree, separate status reports, proposing further proceedings in this matter. The parties shall consider whether another round of summary judgment briefing or trial would be the more efficient method of dispute resolution.

IT IS SO ORDERED.

---

**17.** It also appears that the temporary takings claim in this case is important primarily for its impact on the methodology of determining just compensation. The parties are in substantial agreement on this point. *See* Def.'s Reply at 8, n.

7; Pls.' Opp. at 11–12. In these circumstances, there is no reason why determination of the temporary taking claim should precede the underlying taking claim.